# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

R.R.,                                          )
                                               )      Civil Action No. 09 - 1102
                Petitioner,    )
                                               )       District Judge David S. Cercone
       v.                        )
                                               )
JEFFREY BEARD, *Commissioner,*                 )
*Pennsylvania Department of*                   )
*Corrections*, LOUIS S. FOLINO,                )
*Superintendent of the State*                  )
*Correctional Institution at Greene*,          )
                                               )
Respondents.

## MEMORANDUM OPINION

Robert Rega ("Rega", "Mr. Rega", "Petitioner", "Appellant", or "defendant"), a

state prisoner currently on death-row for crimes unrelated to the underlying convictions

at issue in the instant proceedings,[1] has filed an amended petition for writ of habeas

corpus (Pet'r Am. Pet. for Writ of Habeas Corpus, Apr. 5, 2012, ECF No. 21), and

supplement thereto (Pet'r Supplement Pet. for Writ of Habeas Corpus, July 20, 2012,

ECF No. 25),  challenging his judgment of sentence entered on January 28, 2004, in the

---

[1]     Rega is currently awaiting execution for a homicide conviction (the "Gateway Lodge homicide"). *Commonwealth v. Rega*, CP-33-CR-26-2001 (C.P. Jefferson Co.). He was found guilty by a jury, and the trial court, on June 21, 2002, imposed a sentence of death.  That judgment of sentence was affirmed by the Pennsylvania Supreme Court. *Commonwealth v. Rega*, 933 A.2d 997 (Pa. 2007), *cert. denied*, 128 S. Ct. 1879 (decided April 14, 2008).  At the time of the filing of the criminal complaint charging Rega with the crimes at issue in this case, Rega was already in custody on charges related to the Gateway Lodge homicide.

Court of Common Pleas of Jefferson County, after he was convicted of forty-nine (49) counts of various child sex offenses and four (4) counts of furnishing malt or brewed beverages to minors.[2]  *Commonwealth v. Rega*, CP-33-CR-174-2001 (C.P. Jefferson Co.)  For the following reasons, his petition will be denied.

## I.    Facts of the Crime

The facts of the crime, as set forth in the Pennsylvania Superior Court's Memorandum Opinion and Order on direct appeal, dated August 22, 2005, are as follows:

> We glean the following facts from the certified record.  From June through August of 2000 and in October 2000, Appellant had sexual relationships with four victims, all of whom were under the age of sixteen. During this period, Appellant was thirty-three or thirty-four years old. Victim D.W. was Appellant's neighbor; she was fourteen years old.  Her nine or ten sexual encounters with Appellant during the summer included intercourse, oral and anal sex.  Victim E.H. was D.W.'s friend.  She was twelve years old when she first met Appellant, then turned thirteen during the summer of 2000.  Her ten to fifteen sexual encounters with Appellant during the summer included intercourse and oral sex.
>
> E.H. and D.W. babysat Appellant's children.  He was friendly toward them.  He talked with them, took them to the local swimming hole, downtown, and out to eat; he gave them money and cigarettes.  He also furnished them with alcohol, watched pornographic movies and masturbated in their presence.  All of E.H.'s and D.W.'s sexual encounters with Appellant occurred in his trailer, except for one episode which took place at the Comfort Inn in Clarion, Pennsylvania.  Appellant took the girls there because they wanted to go somewhere with a swimming pool and a hot tub.  After buying beer and snacks for them, Appellant had sex with

---

[2]     The "greater-included" sex charges were: one count of Rape, six (6) counts of Involuntary Deviate Sexual Intercourse (IDSI), and twenty-one (21) counts of Statutory Sexual Assault.  The remainder of the forty-nine (49) charges were "lesser-included" offenses and merged for sentencing purposes.  (Resp't Ex. B, Tr. of Mot. to Recuse and Mot. for Megan's Law Her'g, Jan. 28, 2004, ECF No. 27-2 at pp.166-76.)

each of the girls in the motel room and then returned home with them the next morning.

Victim R.H. was E.H.'s sister and D.W.'s friend; she was fourteen years old. She babysat Appellant's children one night in October 2000. That night, Appellant came home after an evening out with friends and pestered R.H. to have sexual intercourse with him. She eventually acceded to his requests. Victim S.S. knew D.W., E.H., and R.H.; she was thirteen years old. The day after R.H. had sexual intercourse with Appellant, S.S. was at his home with R.H. to baby-sit Appellant's children and his girlfriend's children. Appellant provided R.H. and S.S. with alcohol. As he had with the other girls, Appellant propositioned S.S. to have sexual intercourse with him and led her to his bedroom where he engaged her in intercourse and oral sex.

Around January 28, 2001, E.H. was visiting with Susan Jones (Ms. Jones), a former neighbor of Appellant, at Ms. Jones' house. E.H. reported to Ms. Jones her encounters with Appellant. Ms. Jones advised E.H. to think about what she wanted to do, to go to school the next day, and, if she wanted to report Appellant to the police, to come back after school and Ms. Jones would contact the State Police. The next day, E.H., D.W., and S.S. went to Ms. Jones' house after school wanting to report Appellant's conduct to the police. Ms. Jones walked to a nearby convenience store and telephoned Trooper Davis of the Pennsylvania State Police. Trooper Davis immediately responded to Ms. Jones' house and took the initial report from the three girls. Later that night, Trooper Davis took reports from all four victims at the state police barracks.

(Resp't Ex. P, Pa. Super. Ct. Op. and Order, Aug. 22, 2005, ECF No. 32-3.)


## II.    Procedural History

### A.  Trial and Sentencing

Rega was represented at trial by Attorney George Zanic ("Attorney Zanic" or "trial counsel") and the District Attorney prosecuting the case for Jefferson County was

Attorney Jeffrey Burkett ("DA Burkett" or "the prosecutor")[3].[4]  The jury trial, presided

over by the Honorable John H. Foradora ("Judge Foradora"), lasted two days, May 5-6,

2003, at the conclusion of which Rega was found guilty.  (Resp't Exs. D-E, Jury Trial

Tr., May 5-6, 2003, ECF Nos. 28-1, 29-1.)  On January 28, 2004, Rega was found to be

a "Sexually Violent Predator" under Pennsylvania's Megan's Law and given an

aggregate sentence of 147 to 354 years.  (Resp't Ex. B, Tr. of Mot. to Recuse and Mot.

for Megan's Law Hr'g, Jan. 28, 2004, ECF No. 27-2); (Resp't Ex. E, Sent. Tr., Jan. 28,

2004, ECF No. 29-1.)

B. Post-Sentence and Direct Appeal Proceedings

After sentencing, Attorney George Daghir ("Attorney Daghir" or "post-sentence

counsel" or "direct appeal counsel") was appointed to represent Rega in post-sentence

proceedings and on direct appeal.  Post-sentence motions were filed on February 5,

2004; February 9, 2004; February 11, 2004; March 8, 2004; and April 28, 2004.  (Resp't

Exs. F-J, Post-Sentence Mots., ECF Nos. 29-2, 29-3, 30-1, 30-2, 30-3, 30-4.)  Rega

---

[3]      In addition to being the prosecuting attorney, DA Burkett has remained counsel
for the Commonwealth throughout Rega's appeal and post-conviction proceedings,
including the instant habeas corpus proceedings.

[4]      Attorney Michael English ("Attorney English") was initially appointed as the public
defender to represent Rega in this case.  While these charges were pending, Attorney
English continued this case until after verdict on Rega's homicide case.  After the
verdict on the homicide case, Attorney English filed a Motion to Withdraw as Counsel,
which was granted on all cases in which he represented Rega.  Prior to filing the Motion
to Withdraw as Counsel, Attorney English filed a petition to change venue in all of
Rega's remaining cases due to the extensive publicity received during Rega's two-week
homicide trial in June 2002.  A change of venue was granted and the trial for the
underlying offenses took place in Huntingdon County.  (Resp't Ex. L, C.P. Jefferson Co.
Op. and Order, Jun. 29, 2004, ECF No. 31-1.)

raised twenty-six (26) separate issues in his post-sentence motions. The claims raised

in those motions that are relevant to this habeas proceeding are summarized as follows:

- Improper impeachment of Helaine Flockerzi;
- Trial court error in refusing to grant a mistrial after Susan Jones implicated defendant in an unrelated homicide;

- Violation of defendant's *Miranda* rights;

- Ineffective assistance of trial counsel for failing to object to Trooper Davis' testimony regarding not having any evidence to charge Susan Jones in the Gateway Lodge homicide and the trial court's failure to strike Trooper Davis' testimony regarding same;

- The Commonwealth knowingly presented perjured testimony through Trooper Davis; and

- Ineffective assistance of trial counsel for calling a deputy sheriff to testify as to defendant's genital abnormality instead of a medical doctor.

A post-sentence hearing was conducted on April 28, 2004, after which all of the

motions were denied by Opinion and Order dated June 29, 2004. (Res't Ex. M, Tr. of

Post Sentence Mot. Hr'g, Apr. 28, 2004, ECF No. 31-2); (Res't Ex. L, C.P. Jefferson Co.

Op. and Order, June 29, 2004, ECF No. 31-1.)

Rega filed a direct appeal from his judgment of sentence to the Pennsylvania

Superior Court. *Commonwealth v. Rega*, 1280-1312 WDA 2004 (Pa. Super. Ct.).

Briefs were filed by both parties. (Resp't Ex. N, Br. for Appellant, Oct. 13, 2004, ECF

No. 32-1); (Resp't Ex. O, Br. for Appellee, ECF No. 32-2.)

Rega raised ten (10) issues on direct appeal. The following are relevant to this

habeas proceeding:

- Appellant was denied a fair trial due to the improper impeachment of Appellant's key witness, Helaine Flockerz.

- The trial court committed reversible error in refusing to grant a mistrial when, on cross-examination, the Commonwealth witness, Susan Jones, implicated Appellant in an unrelated homicide.

- Trial counsel was ineffective by failing to object and request a mistrial when the Commonwealth introduced the testimony of Trooper Davis that he did not have any evidence to charge Susan Jones as an accomplice to a homicide, or that Trooper Davis did not have sufficient evidence to charge Susan Jones with the destroying of evidence (gun).

(Resp't Ex. P, Pa. Super. Ct. Op. and Order, Aug. 22, 2005, ECF No. 32-3.)

The Pennsylvania Superior Court affirmed Rega's judgment of sentence by Opinion and Order dated August 22, 2005. (Resp't Ex. P, Pa. Super. Ct. Op. and Order, Aug. 22, 2005, ECF No. 32-3); *Commonwealth v. Rega*, 885 A.2d 583 (Table) (Pa. Super. Ct. Aug. 22, 2005). Judge Klein, however, filed a dissenting Opinion concluding that "the sentencing court abused its discretion in imposing an aggregate sentence of 147 to 354 years' imprisonment, which [he believed] [was] unreasonable under the circumstances of this case." (Resp't Ex. W, Pro Se Appellant Br. Ex. Q, Jun. 18, 2007, ECF No. 55 at pp.188-92.)

Rega then filed a Petition for Allowance of Appeal asking the Pennsylvania Supreme Court for discretionary review. (Resp't Ex. Q, Pet. for Allowance of Appeal, Aug. 22, 2005, ECF No. 33-1.) The petition was denied on December 29, 2005. *Commonwealth v. Rega*, 892 A.3d 822 (Pa. 2005).

C. First PCRA Proceedings

On September 6, 2006, in the Court of Common Pleas of Jefferson County, Rega filed a *pro se* "Petition for Habeas Corpus Relief Pursuant to Article I, Section 14 of the Pennsylvania Constitution and Statutory Post-Conviction Relief under 42 Pa.C.S. § 9542 *et seq*. and Consolidated Memorandum of Law". (Resp't Ex. R, Pro Se PCRA

Pet., Sept. 6, 2006, ECF No. 33-2.)  This petition was construed as a petition filed

pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541 *et*

*seq*. ("*pro se* PCRA petition" or "first PCRA petition").

Rega raised thirteen (13) claims in his *pro se* PCRA petition.  The following

claims are relevant to this habeas proceeding:

- Police obtained statements from defendant in violation of *Miranda* and used those statements to impeach Helaine Flockerzi, a key defense witness at trial, and trial and appellate counsel were ineffective for failing to raise this claim.

- Susan Jones, a Commonwealth witness, implicated defendant in an unrelated homicide, the trial court abused its discretion in denying trial counsel's motion for a mistrial, and appellate counsel was ineffective for failing to properly raise this claim on direct appeal.

- Trial counsel was ineffective for using a deputy sheriff to describe defendant's medical condition instead of using a medical doctor, thus stripping the presumption of innocence from the defendant, and appellate counsel was ineffective for failing to raise this claim on direct appeal.

- The defendant's sentence violated the right to be free from cruel and unusual punishment.

- The cumulative prejudicial effect of all errors described denied defendant the right to due process and all prior counsel were ineffective to the extent they failed to properly object, raise and litigate the within claims at trial and on direct appeal.

(Resp't Ex. R, Pro Se PCRA Pet., Sept. 6, 2006, ECF No. 33-2.)

By Order dated September 21, 2006, and consistent with Pennsylvania Rule of

Criminal Procedure 904, the PCRA court entered an order appointing Attorney

Benjamin Vrobel ("Attorney Vrobel" or first PCRA counsel") to represent Rega in his

PCRA proceedings.  (Resp't Ex. S, C.P. Jefferson Co. Or. of Ct. Appointing Counsel,

Sept. 25, 2006, ECF No. 33-3.)  In a letter to the PCRA court dated October 2, 2006,

Rega stated that he did not ask for counsel to be appointed nor did he want counsel to represent him in his PCRA proceeding. (Resp't Ex. T, Appellee's Answer to Pet. to Remand PCRA Proceedings, Ex. A thereto, Oct. 2, 2006, ECF No. 34-1 at p.10.) In that letter, he stated:

> Judge Foradora,
>
> I am in receipt of your Order dated September 21, 2006, in which you sua sponte, appointed attorney Benjamin Vrobel Esq. to represent me during my P.C.R.A. Petition. You should know that I have not, nor would I ask you to appoint me a lawyer on [appeal]. The only exception in which I would even consider accepting an attorney from you is if you granted an evidentiary hearing, and for that reason only! See, R. Crim. P. 904(D). Thus, after such hearing, I am informing you that I will elect to proceed Pro Se'. See, R. Crim. P. 121(B). Simply put, I have no confidence in your ability to appoint a lawyer to represent me who is not influenced by you as was Mr. Daghir. I will leave it at that for now.
>
> Therefore, if, and until I request counsel, please remove Mr. Vrobel from my case at your earliest convenience. Moreover, any answer the Commonwealth may file to my P.C.R.A. as ordered by the Court must be forwarded to me, and not Mr. Vrobel. He is not my attorney, and I will not recognize him as such in any respect except as provided above. Your failure to do so, (Provide me with a copy of the Commonwealth's answer), will unequivocally deny my access to the Court's consistent with the 5th and 14th Amendments. In short, if I cannot review Mr. Burkett's answer as ordered, I cannot defend my position in Court. I <u>myself</u>, will <u>competently</u> file my own appeal in the Superior Court that reflects the <u>truth</u>, and the actual facts as they pertain to the misconduct, much unlike how Mr. Daghir did in my direct appeal.

*Id.*

In response to this letter, Judge Foradora sent Rega a letter on October 13, 2006, explaining why he had appointed him PCRA counsel; namely that the charges were of a serious nature, that it was Rega's first PCRA petition and that the "interests of justice" required that counsel be appointed. (Resp't Ex. T, Appellee's Answer to Pet. to Remand PCRA Proceedings, Ex. B thereto, Oct. 13, 2006, ECF No. 34-1 at p.11.)

Attorney Vrobel was copied on this letter. *Id*. Rega responded in a letter dated October 18, 2006, which stated:

> Judge Foradora,
>
> I am in receipt of your letter dated October 10, 2006.[5] Notwithstanding your dubious talking points, or your very trite rhetoric, I am still in need of the Commonwealth's response to my (Emphasis Added), P.C.R.A. which was the "essence" of my letter to you. Moreover, my letter was intended to inter alia, inform you that I did not want "your" lawyer to file, amend, or address anything in that answer, or on my case. Again, if a hearing is scheduled, I then will decide whether I want to use him for that purpose only. If you want to waste Jefferson Counties money by having him receive my filings and responses, thus billing the County for it, that's your choice, I am sure the Commissioner's will appreciate that, however all I want is the Commonwealth's response, and for your lawyer to keep his mitts off my case. That's it! I hope I have addressed my position more clearly this time.

(Respt's Ex. T, Appellee's Answer to Pet. to Remand PCRA Proceedings, Ex. C thereto, Oct. 18, 2006, ECF No. 34-1 at p.12.) Per court order, the Commonwealth filed its Answer to Rega's *pro se* PCRA petition on December 29, 2006. Attorney Vrobel had not filed a counseled, amended PCRA petition, so the Commonwealth's Answer addressed only the claims raised in Rega's *pro se* PCRA petition.

Rega filed a Motion for Self Representation on January 5, 2007. (Resp't Ex. U, Mot. for Self Rep., Jan. 5, 2007, ECF No. 34-2.) In that Motion, Rega adamantly argued that the court "misinterpreted" the Rule of Criminal Procedure providing for the appointment of counsel in PCRA proceedings and stated that the court had erred in appointing him an attorney because he had not requested one and had specifically requested to proceed *pro se*. *Id*. He requested that counsel be removed from his case

---

[5] It is assumed that Rega was referring to Judge Foradora's letter dated October 13, 2006, as there is no letter in the record dated October 10, 2006.

immediately, but he also complained that appointed counsel, who he had specifically "not authorized" to file anything on his behalf, had not yet contacted him. *Id*.

On January 9, 2007, the PCRA court issued a notice of intent to dismiss the *pro se* PCRA petition and gave Rega twenty days to file a response. (Resp't Ex. W, Pro Se Br. of Appellant Ex. L thereto, Jan. 9, 2007, ECF No. 55 at p.124.) No response was ever filed.

Also on January 9, 2007, Rega sent another letter to Judge Foradora in which he complained that he had not received the Commonwealth's Answer to his Petition. In addition, he stated:

> . . . I filed a motion to represent myself on appeal due to your erroneous (forced) appointment of Mr. Benjamin Vrobel. Since it appears that no evidentiary hearing will be held on my meritorious claims of ineffective counsel, R. Crim. P. 121(C), requires that a colloquy be held so that I can waive the right to counsel, thus I request that one be held as soon as possible. If I am ambushed, compelled to accept a lawyer I know will deliberately sabotage my appeal, I will appeal any Order denying my right to proceed Pro Se'. Moreover, a complaint will be filed with the Judicial Conduct Board.
>
> In closing I request that I be provided with the Commonwealth's answer to my petition for P.C.R.A. relief, and that a Colloquy be conducted as soon as possible so that Mr. Vrobel can be removed from my case and as counsel of record.

(Resp't Ex. T, Appellee's Answer to Pet. to Remand PCRA Proceedings, Ex. F thereto, Jan. 9, 2007, ECF No. 34-1 at p.15.) Three days later, Rega wrote again, stating:

> Dear Judge Foradora,
>
> This letter is to officially notify you that with request to my motion for self-representation, R. Crim. P. 577 (B), unequivocally states that, "The judge promptly shall dispose of any motion". Therefore, if I am not either brought to the Jefferson County Courthouse for colloquy by the time your final order is entered dismissing my P.C.R.A. petition, (i.e.), January 29, 2007, or I do not receive a final order denying my clear right to self

representation so that I may appeal, I will be filing a Writ of Mandamus with the Commonwealth Court under its original jurisdiction pursuant to 42 Pa. C.S.A. §761, compelling you to do one or the other.

Respectfully, I believe that you are deliberately attempting to circumvent my clear constitutional right to represent myself after requested, and asserted under *Faretta v. California*, 422 U.S. 806 (1974). This I believe is due to the fact that you now realize that I have redress coming in the appellate courts on this case, and you are now trying to stop it by forcing the appointment of Mr. Benjamin Vrobel who will, like did George Daghir had, file an inept brief so as to obtain affirmation of your order denying my P.C.R.A. petition.

In closing, in said Writ, I will be attaching a copy of all your previous letters which address this issue, along with this letter, my motion and a copy of the Superior Court's opinion from my direct appeal so as to substantiate the allegations as asserted above. I respectfully request that I be brought to the courthouse for colloquy, or in the alternative, a telephone colloquy be held, or an order denying my motion. Thank you kindly for your time.

(Resp't Ex. T, Appellee's Answer to Pet. to Remand PCRA Proceedings, Ex. E thereto, Jan. 12, 2007, ECF No. 34-1 at p.14.)

Due to Rega's Motion for Self Representation, and correspondence with the PCRA court, a waiver of counsel hearing was set for February 12, 2007, so that Rega could be given a colloquy to waive his right to counsel. Present at the hearing were, *inter alia*, DA Burkett and Attorney Vrobel. Rega appeared via telephone. The PCRA court notified him of his right to have court appointed counsel, but Rega refused. (Resp't Ex. V, Tr. of Hr'g, Feb. 12, 2007, ECF No. 34-3.) In addition, the PCRA court warned Rega that he could not later claim mistake on his part because he would be held to the same standard as an attorney. *Id*. Knowing that risk, Rega stated, "Absolutely," when asked if he wanted to waive his right to counsel. *Id*.

After waiving his right to counsel, the PCRA court dismissed Rega's *pro se* PCRA petition on February 27, 2007, without an evidentiary hearing. (Resp't Ex. W, C.P. Jefferson Co. Or. of Ct., Feb. 27, 2007, ECF No. 55 at p.16.)

Rega filed an appeal and brief in the Pennsylvania Superior Court at 470 WDA 2007. (Resp't Ex. W, Pro Se PCRA Pet., June 18, 2007, ECF No. 55.) He presented eleven (11) claims for appeal. Of those claims, the following are relevant to this habeas proceeding:

- Whether prior counsel were ineffective for failing to challenge the sufficiency of the evidence and specifically argue that the evidence was insufficient to sustain the multiple counts of sexual assault due to complainants E.H. and D.W.'s inability to recall the exact number of sexual encounters that they had had with appellant, their inability to identify the specific dates of their encounters, and their use of terms such as "maybe," "I don't know," and "a lot."

- Whether prior counsel were ineffective for failing to challenge the Commonwealth's impeachment of a defense witness, Helaine Flockerzi.

- Whether appellate counsel was ineffective for failing to seek relief based upon trial counsel's elicitation of testimony from a witness for the Commonwealth that implicated appellant in an unrelated homicide?

- Whether appellate counsel was ineffective by abandoning his claim that trial counsel was ineffective for calling a deputy sheriff to testify on behalf of appellant?

- Whether appellant is entitled to relief based upon the cumulative prejudicial effect of the errors at trial?

(Resp't Ex. W, Pro Se PCRA Pet., June 18, 2007, ECF No. 55); (Resp't Ex. CC, Pa. Super. Ct. Op. and Order, May 22, 2008, ECF No. 35-3.)

After he filed his appellate brief, and before the Commonwealth filed its response brief, Rega's present counsel, Attorney Hunter Lebovitz ("Attorney Lebovitz") with the Capital Habeas Corpus Unit of the Federal Community Defender Office in Philadelphia,

Pennsylvania, entered his appearance in the Superior Court.[6] *See Commonwealth v. Rega*, 470 WDA 2007 (Pa. Super. Ct.) (docket entry dated August 22, 2007). On August 21, 2007, Attorney Lebovitz filed a petition to remand the proceedings back to the PCRA court so that a counseled, amended PCRA petition could be filed on Rega's behalf. (Resp't Ex. X, Appellant's Pet. to Remand PCRA Proceedings, Aug. 21, 2007, ECF No. 56.) Attorney Lebovitz asserted that Rega's "waiver of his right to PCRA counsel was not knowing, intelligent and voluntary" because "the record colloquy was insufficient to apprise Mr. Rega of what rights he was forfeiting," and "even if there was a sufficient colloquy, [Attorney Vrobel's] ineffectiveness prior to the colloquy rendered Mr. Rega's waiver unknowing and thus invalid." *Id*. at p.6. The focus of the petition to remand was that the PCRA court and Attorney Vrobel failed to appropriately explain to Rega that an attorney could conduct extra-record investigation that Rega would not be able to conduct while incarcerated. *Id*. It was also asserted that Attorney Vrobel effectively "abandoned" Rega during the PCRA proceedings. *Id*.

The Commonwealth filed its Answer to the petition to remand on September 5, 2007. (Resp't Ex. T, Appellee's Answer to Pet., Sept. 5, 2007, ECF No. 34-1.) On September 17, 2007, the Commonwealth also filed its appellate brief in response to Rega's PCRA appeal. (Resp't Ex. TT, Br. for Appellee, Sept. 17, 2007, ECF No. 42-1.)

---

[6] Attorney Lebovitz with the Federal Community Defender Office still remains counsel for Rega.

Rega's counsel then filed a supplemental petition to remand in which he requested to expand the record to include evidence of alleged *Brady* violations.[7] (Resp't Ex. Y, Appellant's Supp. Pet. to Remand, Oct. 3, 2007, ECF No. 57.) The Commonwealth also filed an Answer to this supplemental petition. (Resp't Ex. Z, Appellee's Answer to Supp. Pet. to Remand, Oct. 15, 2007, ECF No. 58.) Counsel for Rega then filed a Reply to the Commonwealth's Answer, raising issues that had not been previously litigated. (Resp't Ex. AA, Appellant's Reply Br., Oct. 3, 2007, ECF No. 35-1.) For this reason, the Commonwealth filed an application to strike the brief, but the Superior Court deferred its ruling on the matter until it issued its final Memorandum decision. (Resp't Ex. BB, Appellee's Mot. to Strike Appellant's Reply Br., Oct. 12, 2007, ECF No. 35-2.)

On May 22, 2008, the Superior Court issued an Opinion and Order denying Rega's petitions to remand, striking his Reply Brief, and affirming the PCRA court in *toto*. (Resp't Ex. CC, Pa. Super. Ct. Op. and Order, May 22, 2008, ECF No. 35-3); *Commonwealth v. Rega*, 954 A.2d 41 (Table) (Pa. Super. Ct. May 22, 2008). Rega then sought discretionary review in the Pennsylvania Supreme Court at docket 307 WAL 2008. (Resp't Ex. DD, Pet. for Allowance of Appeal, Jun. 19, 2008, ECF No. 36-1.) That petition was denied on January 27, 2009. *Commonwealth v. Rega*, 307 WAL 2008 (Pa. Jan. 27, 2009).

D. Second PCRA Proceedings

---

[7]     *Brady v. Maryland*, 373 U.S. 83 (1963) (requiring that a prosecutor disclose favorable evidence to the accused, including impeachment and exculpatory evidence).

On July 21, 2008, while Rega's petition for allowance of appeal was still pending in the Pennsylvania Supreme Court, Rega's counsel, Attorney Lebovitz, filed a second PCRA petition in the Jefferson County Court of Common Pleas. (Resp't Ex. EE, Second PCRA Pet., July 18, 2008, ECF No. 36-2); (Resp't Ex. FF, Appendix to Second PCRA Pet., ECF No. 37-1.) The PCRA court entered an order expressing its intent to dismiss the second PCRA petition, without prejudice, as premature because Rega's first PCRA proceedings had not yet concluded. (Resp't Ex. GG, C.P. Jefferson Co. Notice of Intent to Dismiss PCRA Filing and Order on Mot. to Stay Proceedings, July 30, 2008, ECF No. 37-2.) Specifically, this was because Rega's petition for allowance of appeal was still pending in the Pennsylvania Supreme Court. *Id*. In its notice of intent to dismiss the second PCRA Petition, the PCRA court further dismissed Rega's request to stay the proceedings pending the outcome of his first PCRA request for review to the Pennsylvania Supreme Court. *Id*. Rega also requested habeas corpus relief, but at that time the court declined to address the petition insofar as it sought habeas corpus relief. *Id*. However, on August 25, 2008, the PCRA court denied Rega's second PCRA petition insofar as it requested habeas relief, noting that Rega's claims were not proper issues for habeas corpus relief because they were all cognizable under the PCRA, and the court dismissed the petition insofar as it represented a second PCRA petition. (Resp't Ex. HH, C.P. Jefferson Co. Order of Ct., Aug. 25, 2008, ECF No. 37-3.)

E. Third PCRA Proceedings

Rega, through Attorney Lebovitz, filed his third PCRA petition on March 30, 2009. (Resp't Ex. II, Third PCRA Pet., Mar. 26, 2009, ECF No. 38-1); (Resp't Ex. JJ, Appendix

to Third PCRA Pet., ECF No. 38-2.)  That petition contained the following ten (10)

claims, which are all relevant to these proceedings, and are summarized as follows:

I.     Mr. Rega was denied due process of law and the right to confront his accuser when the Commonwealth suppressed favorable evidence that was material to his ability to present a defense at trial and would have undermined the credibility of the key Commonwealth witness.

II.    Mr. Rega was denied due process of law, the right to a fair trial, and the right to confront his accusers when the Commonwealth not only failed to correct false and misleading testimony offered by and in support of the Commonwealth's key witnesses, but also made false and misleading representations to the Court and the jury.

III.   Mr. Rega was denied due process of law and the right to confront his accuser as a result of the cumulative effect of all suppressed and false and misleading evidence under *Brady* and *Napue*.

IV.    Mr. Rega was denied his right to the effective assistance of counsel and due process of law because PCRA counsel's complete abandonment of any representation of Mr. Rega to waive his right to file a counseled, amended PCRA petition.

V.     Mr. Rega was denied due process of law, the right against self-incrimination, the right to counsel, and the right to effective assistance of counsel when the Commonwealth improperly impeached the key defense witness without challenge by trial or appellate counsel.

VI.    Mr. Rega was denied the right to effective assistance of counsel when trial counsel failed to timely locate and adequately interview, prepare and present a key defense witness.

VII.   Mr. Rega was denied due process of law, a fair trial, proof of guilt beyond a reasonable doubt and a unanimous jury verdict on all counts when he was convicted of multiple sex offenses based on generic and nonspecific testimony.

VIII.  Mr. Rega was denied due process of law and a fair when he was deprived of notice of the specific charges against him and his right to present a defense.

16

IX.     Mr. Rega was denied his right to the effective assistance of
        counsel, due process of law and a fair trial when trial counsel
        unsuccessfully attempted to prove Mr. Rega's exculpatory genital
        abnormality through the testimony of a witness who did not have
        knowledge of the relevant issue.

X.      Mr. Rega was denied his right against cruel and unusual
        punishment when he was sentenced to a maximum of 354 years
        imprisonment, a penalty that is grossly disproportionate to the
        offenses for which he was convicted.

(Resp't Ex. II, Third PCRA Pet., Mar. 26, 2009, ECF No. 38-1.)

The Commonwealth filed its Answer to the petition on September 3, 2010.

(Resp't Ex. KK, Answer to Third PCRA Pet., Sept. 3, 2010, ECF No. 39-1.)  The PCRA

court reviewed the third PCRA petition and entered a Notice of Intent to dismiss it on

September 10, 2010.  (Resp't Ex. LL, C.P. Jefferson Co. Notice of Intention to Dismiss

Third PCRA Pet., Sept. 10, 2010, ECF No. 39-2.)  In that Notice of Intent, the PCRA

court specifically addressed the timeliness of Rega's claims and concluded that the

petition "in its entirety [was] irredeemably late for purposes of the Post Conviction Relief

Act, § 9541 *et seq.*"  *Id.*

For reasons that will be explained throughout this Opinion, the PCRA court's

resolution of Rega's third PCRA petition is **significant** to almost every claim he raises in

these habeas proceedings.  Thus, we will set forth the majority of the PCRA court's

Notice of Intention to Dismiss, as it will often be referred to herein.

Timeliness of Petition – *Brady* Claims:

. . . .

The only presently asserted claims to which the § 9545(b)
exceptions arguably apply include Claims for Relief I-III, which encompass
Rega's Brady-related allegations and comprise the bulk of the Petition.  In
fact, however, those exceptions do not apply

17

. . . .

In seeking to excuse his untimeliness, Rega asks the Court to find that the district attorney interfered with the presentation of his claim by failing to disclose pertinent Brady information about plea negotiations and a deal it purportedly had with Susan Jones ("Jones") and that he, despite the exercise of due diligence, was unable to discover the information in time to raise his Brady claim within a year of his judgment of sentence becoming final. The record, including the exhibits contained in Rega's own appendix, tells a different story.

. . . .

Because Jones's charges were a matter of public record long before March 29, 2007 – one year after the judgment of sentence became final, Rega could have, with minimal diligence obtained copies of the police criminal complains, criminal informations, continuance request forms, and plea colloquy that were filed. He then would have known what all Jones had been charged with; that she ultimately pled to only four charges; the terms of her sentencing agreement; and that plea negotiations were supposedly being conducted even before his trial began. Had he taken the initiative to obtain those documents, their contents would have further alerted him to the existence of the plea and sentencing transcript and the possible need to obtain additional, extra-record information relative to the suspected *Brady* violation.

Rega did not take even the initial step to look at the records, though. Thus, his ignorance of the basic facts he says support his *Brady* claim arose from his own failure to pursue them prior to the expiration of the one-year PCRA time constraint, not from anything the Commonwealth did to interfere with the claim's presentation. That was not due diligence.

Rega's incarceration and *pro se* status during the pendency of his first PCRA petition do nothing to change that, either. The Court appointed PCRA counsel for that litigation, but Rega elected to waive counsel and proceed *pro se* – a waiver the Superior Court unequivocally ruled was made knowingly and intelligently. *Commonwealth v. Rega*, No. 470 WDA 2007, pp. 6-10 (Pa. Super. 2008 ) (unpublished memorandum). The Supreme Court implicitly affirmed that decision when it denied allocator on January 27, 2009. Accordingly, Rega cannot legitimately blame his originally appointed PCRA counsel for his failure to become aware of the facts allegedly supporting a *Brady* claim. He opted to waive counsel and accepted both the perceived benefits and potential consequences of that decision. *See Commonwealth v. Fletcher*, 986 A.2d 759, 777-79 (Pa. 2009) (declining to revisit the rule that a *pro se* PCRA defendant could not later challenge his own effectiveness).

Claims I-IX clearly do not fall within the exceptions to 42 Pa.C.S.A. § 9545(b).  That includes his fourth claim since he was well aware of PCRA counsel's "complete abandonment of any representation" and withdrawal prior to the Court's dismissal of his first petition.

Timeliness of Petitioner – Sentencing Claim:

Though he does not attempt to fit it into the § 9545(b) exceptions, the defendant also maintains that his last claim, wherein he proposes that his aggregate sentence amounted to cruel and unusual punishment, cannot be deemed untimely due to the fact that it raises the legality of the sentence and thus can never be waived.

While the Court completely agrees that a defendant never forfeits the right to challenge an illegal sentence, it does not agree that a claim founded on the Eighth Amendment constitutes such a challenge.
. . . .

That is not to say that Rega has waived the claim.  As a factual matter, he raised the argument at post-sentence motions and again in his first PCRA petition.  It is to say, however, that he cannot assert its non-waivability as an avenue to bypass the generally applicable one-year time limit imposed by § 9545.

Issues Waived or Previously Litigated – Claims I-IX:

Even had Rega filed the Petition in a timely manner, the Court would still deem it dismissible due to the fact that each of his ten issues have been previously litigated or waived.  FN (It is of no moment toward the question of whether issues were waived or fully litigated that Rega in fact raised his third petition issues in his second petition, because that petition, having been filed July 21, 2008, was also untimely filed and thus subject to the same legal analysis as is set forth in this Notice.)  For PCRA purposes, an issue has been waived if the petitioner could have but failed to raise it prior to trial, at trial, during unitary review, on appeal, or in a prior state postconviction proceeding and fully litigated if it has been decided on its merits by the highest appellate court in which the petitioner has the right of review.  § 9544

As the Court explained above, many of the factual materials upon which Rega relied to fashion his *Brady* claim, including police complaints, criminal informations, continuance requests, Jones' plea colloquy, and her plea and sentencing transcript, were available or attainable well before March 29, 2007.  That being the case, Claims I-III could have easily been raised in the defendant's first petition.  FN (With greater diligence, in fact,

it could have been addressed as an amendment to post-sentence motions. The hearing on these motions did not occur until April 28, 2004 – two months after Jones pled and was sentenced, and the Court did not file its opinion until July 2, 2004. Everything else, though, including Rega's direct knowledge that Jones had not spent time in jail on her charges, was recorded and available long before then.)

Claim IV, where Rega seeks relief "because PCRA counsel's complete abandonment of any representation of Mr. Rega compelled Mr. Rega to waive his right to file a counseled, amended PCRA petition," on the other hand, while not waived, has been fully litigated. As determined by the Superior Court in a lengthy written discussion, Rega participated in an appropriate oral colloquy with the Court after which he made an intelligent waiver of his right to counsel. *Commonwealth v. Rega*, 470 WDA 2007 at 6-10. (See also February 12, 2007 transcript of that colloquy.) Implicit to that discussion was that he was not compelled to waive his right to file a counseled, amended PCRA petition. The issue, therefore, though worded differently than it was in the first petition, has been fully litigated. *See Commonwealth v. Gwynn*, 943 A.2d 940, 944-45 (Pa. 2008) (reiterating that an "issue" refers to the discrete legal ground that would entitle a defendant to relief and, therefore, that an issue has been previously litigated if what the defendant asserts is merely an alternative theory in support of the same underlying issue rather than a discrete legal ground (citing *Commonwealth v. Collins*, 888 A.2d 564 (Pa. 2005)). *See also Commonwealth v. Small*, 980 A.2d 549, 569 (Pa. 2009) (same). FN (In consideration of *Gwynn*, the Court will not address all of the sub-issues raised by Rega, as they amount to alternative theories in support of the main issues, Issues I – X, and are thus subject to the same rule governing waiver or issues previously litigated.)

Claim V has likewise been fully litigated. Rega questioned the Commonwealth's impeachment of Helaine Flockerzi in his direct appeal, and the Superior Court, agreeing with this Court's treatment of the matter, concluded that it was appropriate as going toward the witness's bias. *Commonwealth v. Rega*, No. 128-1312 WDA 2004, pp. 8-11 (Pa. Super. 2005) (unpublished memorandum), alloc. denied, 892 A.2d 822 (Pa. 2005). In that same opinion, the Court also rejected Rega's claim based on defense counsel's failure to object when the Commonwealth implicated Ms. Flockerzi in crimes for which she was not convicted, concluding that he was not entitled to relief on its resolution of the underlying issue. *Id*. at 25. Nearly three years later, deciding the merits of Rega's first PCRA petition, the Court again refused him relief relative to his claims surrounding the treatment of Ms. Flockerzi. *Rega*, 470 WDA 2007 at 14-15. Although the issue was cast somewhat differently and alleged the ineffectiveness of both trial and appellate counsel, the Court deemed it to

have been "previously and thoroughly litigated" and denied relief. *Id*. at 15.

Having not been raised previously, Claim VI has been waived. Though he has earlier complained about the absence of other witnesses, including his ex-wife, this is the first time Rega has said anything about trial counsel's failure to secure Ms. Flockerzi's presence at trial or have her adequately prepared to testify. That issue was certainly available and known to the defendant even before the conclusion of trial, however. He thus could have but failed to raise it, which amounts to waiver under § 9544.

Claim VII has already been fully litigated. Cast as a due process issue, it challenges the sufficiency of the evidence, as Rega contends that the victims' "generic and nonspecific testimony" was inadequate to support his multiple sex convictions.

Through trial counsel, Rega first raised this issue at the close of the Commonwealth's case by orally requesting judgment of acquittal on all charges, arguing that the victims' testimony was insufficient to establish each offense charged beyond a reasonable doubt. (Trial Transcript ("TT"), 05/06/2003, p. 158-59). The Court then went through the testimony and struck some of the charges, but concluded that most of them would be submitted to the jury to determine what weight to give the fact that the victims could not be more specific than they were. (Id. at 158-61). Raised again on post-sentence motions, the Court again denied the issue by reference to the trial transcript. FN (The victims' testimony can be read at pages 89-141 of the May 5, 2003 transcript and 8-72 of the May 6, 2003 transcript.)

Rega chose not to pursue his insufficiency claim on direct appeal to the Superior Court. He reasserted a variation of it in his first PCRA petition, however, claiming generally that the testimony was insufficient to support the sex convictions, and specifically that the Commonwealth had not proven the charges of statutory sexual assault, IDSI, and indecent assault as a result of failing to establish that the victims were not married to him.

Focusing most of its attention on the specific allegation, the Superior Court deemed the issue to be "patently meritless." *Rega*, 470 WDA 2007 at 11-13. It also considered the defendant's position that the victims' lack of specificity invalidated the convictions, however, *id*. at 11, and, considering the relevant legal standard for weighing a sufficiency of the evidence challenge, deemed Rega not to be entitled to relief upon any of his individual claims. *Id*. at 11-12, 25.

Whether or not the Superior Court specifically articulated its reasons for rejecting Rega's generalized challenge to the sufficiency of the evidence, moreover, the Court would note that his marriage-related argument was nonetheless addressed to the sufficiency of the evidence pertinent to all of the sex charges, excepting rape, and that, therefore, Claim VII is nothing more than an alternative theory for a discrete legal issue – the sufficiency of the evidence – already advanced and fully addressed by the Superior Court. *See Commonwealth v. Gwynn*, *supra*.

Claim VIII has been waived. The law allowed Rega to request that the Commonwealth file a bill of particulars that would more definitively articulate what it intended to prove at trial. Trial counsel did not do that on his behalf. That omission, however, has always been part of the record, and Rega could have challenged trial counsel's failure to file a bill of particulars at post-sentence motions, on direct appeal, or in his first PCRA petition. Until now, though, Rega did not challenge either trial counsel's failure to request one or appellate counsel's failure to point out the omission. Nor did he challenge either attorney's effectiveness on that basis in his first PCRA petition. He thus cannot raise the issue now.

Claim IX has already been fully litigated through our Superior Court.

In his third Petition, Rega again tries to raise the proposition that calling Deputy Sheriff Kurt Brud[k]nock to testify about his genital abnormality functioned to strip him of his presumption of innocence. The Superior Court addressed the merits of that exact issue in its May 22, 2008 memorandum opinion, though. *Rega*, 470 WDA 2007 at 18-19. Alternatively, he argues, a doctor with knowledge of his deformity should have been called since the deputy had no knowledge of his medical condition and thus could not effectively rebut the victims' testimony that there was nothing abnormal about his genitalia. Thus, in the Court's view, is but an alternative theory propounded to support the underlying legal issue.

Even were the Court to conclude that this second argument deserved consideration as a separate and distinct legal issue, however, it would nonetheless deem it to be without merit. As noted by the Superior Court, Brud[k]nock was in fact not the only witness to comment on Rega's genitalia. Helaine Flockerzi, who was the defendant's girlfriend during the relevant time period, also testified that his testicles were "bigger than normal," (TT, 05/06/2003, pp. 163-64), and even if the Commonwealth's cross-examination led the jurors to conclude that she was not credible with regard to the ultimate issues, the Court finds it difficult to imagine that they would have doubted her observations about her boyfriend's testicles.

22

Especially when the size of the defendant's testicles was a minor issue he could have used to further impeach the victims' credibility, however, and because it was for the jurors to determine for themselves the girls' general understanding about the dimensions of a man's testicles, the Court would conclude that Rega has not made a strong *prima facia* showing of success on his second Claim IX argument since the jury already had the testimony of Brud[k]nock and Flockerzi to weigh against the victims' testimony that there was nothing outstanding about his genitalia.

Finally, because Claim X does not in fact pose a non-waivable challenge to the legality of Rega's sentence (see the Court's discussion at page 4-5), it must be regarded as a contest to its discretionary aspects. As such, the issue has been fully litigated.

Before the Superior Court on direct appeal, Rega raised the legal issue of the discretionary aspects of his sentence, choosing to focus on whether the Court imposed an appropriate sentence under the sentencing guidelines and whether it abused its discretion by imposing multiple consecutive sentences. *Rega*, 1280-1312 WDA 2004 at 6-7. The Court denied both allegations of error, observing that the Court had stayed within the guidelines and had thus treated Rega's crimes like those of other sexual offenders and noting that the Court had given its reasons for imposing consecutive sentences – reasons that it deemed to be appropriate and acceptable. *Id*. at 7-8.

Albeit under a different rubric, therefore, Rega was challenging on direct appeal the Court's imposition of a sentence with a three hundred fifty-four year maximum term, and the Superior Court, after considering the issues on its merits, deemed the sentence not to represent an abuse of discretion. Posed now as an Eighth Amendment question, Claim X raises the identical concern. The Court clarified in *Commonwealth v. Goggins*, 748 A.2d 721 (Pa. Super. 2000), however, that in challenging the term of years imposed by the sentencing court, including an unusually long term of years, a defendant thereby challenged a discretionary aspect of the sentence. *Id*. at 727. In refining the standards applicable when appealing the discretionary aspects of a sentence, the Court reiterated that a Rule 2119(f) statement must state with specificity the fundamental norm allegedly violated and the manner of violation. *Id*. It them provided the following example: "the sentence is unreasonable or the result of prejudice because it is 500 percent greater than the extreme end of the aggravated range," *id*., thereby demonstrating that a claim of excessiveness, however severe, was nonetheless a challenge to the discretionary aspects of a sentence.

As noted above, Rega appealed his sentence during direct review and he specifically questioned whether the Court had abused its discretion by imposing the sentence it did. Pursuant to *Robinson* and *Goggins*, the challenge he raises now is but a third proposed basis for finding that the Court abused its discretion. It is thus an alternative theory advanced in support of a discrete legal issue fully litigated on direct appeal. Accordingly, the defendant is precluded by 42 Pa.C.S.A. §§ 9543-9544 from relitigating it in this Petition.

. . . .

Because the Court cannot discern anything that would entitle Rega to a waiver of the one-year requirement under § 9545(b) or that would otherwise entitle him to the relief he seeks, the Court hereby notifies the defendant of its intent to dismiss the third PCRA petition….

. . . .

(Resp't Ex. LL, C.P. Jefferson Co. Notice of Intention to Dismiss Third PCRA Pet., Sept. 10, 2010, ECF No. 39-2.)

Rega's counsel filed a response to the Notice contending that his *Brady* claim should survive given certain testimony adduced at the PCRA hearing in Rega's capital case and to clarify and reallege PCRA counsel Attorney Vrobel's ineffectiveness. (Resp't Ex. MM, Resp. to Notice of Intention to Dismiss Third PCRA Pet., Sept. 29, 2010, ECF No. 39-3); (Resp't Ex. NN, C.P. Jefferson Co. Op. and Order, Oct. 12, 2010, ECF No. 40-1.) With respect to this argument, the PCRA court stated that

. . . although the Court has yet to rule on that claim in Rega's capital case, the substance of the hearing testimony makes no difference to his claim in this case. Whether or not the Court later finds that the hearing testimony establishes that the Commonwealth did in fact enter into plea negotiations with Susan Jones prior to Rega's trial, the fact remains that the timeliness exception articulated in 42 Pa.C.S.A. § 9545(b)(ii) only applies where the defendant was unaware of the predicate facts and could not ascertain them through the exercise of due diligence. *Id*. Meeting the first prong is simply not enough.

And therein lies the major obstacle for Rega.  The Court can agree that he was not actually privy to the facts upon which he founds his *Brady* claim.  As it clearly articulated in its Notice of Intention to Dismiss, however, he could have discovered Jones'[] police criminal complaints, criminal informations, continuance request forms, and plea colloquy long before the expiration of time for filing a PCRA petition.  That information alone would have allowed him to raise the issue in the first place and thereafter flesh out his *Brady* issue as it is now more fully developed.

This Court thus stands by its determination that Rega affirmatively neglected to make himself aware of facts of record suggesting the possibility that the Commonwealth ignored its obligations under *Brady*; that it was his failure, not the Commonwealth's, that thus deprived him of the ability to raise the claim within one year of his judgment of sentence becoming final; and that, as a result, he has no remedy under the Post Conviction Relief Act with respect to Claims I-III.

The Court further stands by its decision pertaining to Claim IV.  The Court fully understands the scope of Rega's ineffectiveness claim.  Nonetheless, nothing he says in his Response changes the fact that the Superior Court thoroughly addressed Mr. Vrobel's alleged ineffectiveness in its opinion on his *pro se* petition and determined not only that Rega had knowingly and intelligently waived his right to PCRA counsel, but also that this Court had conducted a satisfactory oral colloquy prior to accepting his waiver.  The Superior Court found, therefore, that Rega was sufficiently apprised of all he needed to know in order to enter an effective waiver.  Accordingly, and as this Court previously stated, Claim IV has been previously litigated for purposes of the PCRA.  At this point, therefore, the only person who could arguably be deemed ineffective was Rega himself.

(Resp't Ex. NN, C.P. Jefferson Co. Op. and Order, Oct. 12, 2010, ECF No. 40-1.)  The

PCRA court dismissed Rega's third PCRA petition, without a hearing, on October 12,

2010.  *Id*.

Rega appealed to the Superior Court by brief filed on May 19, 2011.  (Resp't Ex.

UU, Br. of Appellant, May 19, 2011, ECF No. 42-2); (Resp't Ex. VV, Appendix to Br.,

ECF No. 43-45.)  Rega presented the following eight (8) issues for consideration,

summarized as follows:

I.      Whether the lower court erred in dismissing without a hearing
        Appellant's claims that the Commonwealth violated due process
        and confrontation rights by suppressing material impeachment
        evidence about a key prosecution witness and by eliciting, failing to
        correct and presenting false and misleading testimony and
        argument.

II.     Whether the lower court erred in dismissing without a hearing
        Appellant's claim that he was denied his right to effective
        assistance of counsel and due process because PCRA counsel
        completely abandoned him during PCRA proceedings.

III.    Whether the lower court erred in dismissing without a hearing
        Appellant's claim that he was denied due process, the right to
        effective assistance of counsel when the Commonwealth
        improperly impeached the key defense witness without challenge
        by trial or appellate counsel.

IV.     Whether the lower court erred in dismissing without a hearing
        Appellant's claim that he was denied the right to effective
        assistance of counsel when trial counsel failed to timely locate and
        adequately interview, prepare and present a key defense witness.

V.      Whether the lower court erred in dismissing without a hearing
        Appellant's claim that he was denied due process, proof of guilt
        beyond a reasonable doubt and a unanimous jury verdict on all
        counts when he was convicted of multiple sex offenses based on
        generic and nonspecific testimony.

VI.     Whether the lower court erred in dismissing without a hearing
        Appellant's claim that he was denied due process when he was
        deprived of notice of the specific charges against him and his right
        to present a defense.

VII.    Whether the lower court erred in dismissing without a hearing
        Appellant's claim that he was denied his right to the effective
        assistance of counsel and due process when trial counsel
        unsuccessfully attempted to prove Appellant's exculpatory genital
        abnormality through the testimony of a witness who did not have
        relevant knowledge.

VIII.   Whether the lower court erred in dismissing without hearing
        Appellant's claim that he was denied his right against cruel and
        unusual punishment when he was sentenced to a maximum of 354

years of imprisonment, a penalty grossly disproportionate to the
offenses for which he was convicted.

(Resp't Ex. WW, Pa. Super. Ct. Op. and Order, Nov. 18, 2011, ECF No. 46-1.)

The Commonwealth did not file a responsive brief, and, on November 18, 2011,

the Superior Court affirmed the PCRA court's finding that the petition was time-barred

and that Rega had failed to satisfy any of the exceptions to the PCRA's timeliness

requirement. (Resp't Ex. WW, Pa. Super. Ct. Op. and Order, Nov. 18, 2011, ECF No.

46-1.) The Superior Court stated "that the record support[ed] the PCRA court's findings

and its conclusions are without error; therefore, there were no material issues of fact."

*Id*.


III.    **Standard of Review**

A.  <u>AEDPA and State-Court Deference</u>

Under 28 U.S.C. § 2254, "[t]he Supreme Court, a Justice thereof, a circuit judge,

or a district court shall entertain an application for a writ of habeas corpus in behalf of a

person in custody pursuant to the judgment of a State court only on the ground that he

is in custody in violation of the Constitution or laws or treaties of the United States." 28

U.S.C. § 2254(a). Errors of state law are not cognizable in a federal habeas action.

*See*, *e.g.*, *Priester v. Vaughn*, 382 F.3d 394, 402 (3d Cir. 2004) ("Federal courts

reviewing habeas claims cannot 'reexamine state court determinations on state-law

questions.'") (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)).

In describing the role of federal habeas proceedings, the United States Supreme

Court noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence…. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

*Barefoot v. Estelle*, 436 U.S. 880, 887 (1983). In 1996, Congress enacted AEDPA, which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). AEDPA "requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations." *Lambert v. Blackwell*, 387 F.3d 210, 234 (3d Cir. 2004); *see also Lewis v. Horn*, 581 F.3d 92, 109-18 (3d Cir. 2009). AEDPA reflects the view that habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 786 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment)).

State court findings of fact have always been accorded considerable deference in federal habeas corpus cases filed by state inmates. As the Court of Appeals for the Third Circuit has explained:

It is a well-established principle of federal law that state trial judges deserve substantial deference.

> Face to face with the living witnesses, the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases, the exercise of his power of observation often proves the most accurate method of ascertaining the truth . . . how can we say he is wrong? We never saw the witnesses.

*Nara v. Frank*, 488 F.3d 187, 201 (3d Cir. 2007) (quoting *United States v. Oregon Medical Society*, 343 U.S. 326, 339 (1952), which was quoting *Boyd v. Boyd*, 169 N.E. 632 (N.Y. 1930)).

AEDPA continued that substantial deference. Section 2254(e)(1), as amended by AEDPA, expressly provides that "a determination of a factual issue made by a State court *shall be presumed to be correct*. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1) (emphasis added).

AEDPA also requires that federal habeas corpus courts give substantial deference to the legal determinations of the state court when it has adjudicated a claim on the merits; however, very few of the claims in this case were adjudicated on the merits. Nevertheless, this standard of review is codified at 28 U.S.C. § 2254(d) and it provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Thus, AEDPA circumscribes a federal habeas court's review of a state prisoner's constitutional claim when the state court adjudicated that claim on the merits and denied

it.  For the purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when a state court has made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground.[8]  *See, e.g.*, *Richter*, 131 S. Ct. at 784-85; *Robinson v. Beard*, 762 F.3d 316, 324 (3d Cir. 2014).  "Section 2254(d) applies even where there has been a summary denial."  *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1402 (2011) (citing *Richter*, 131 S. Ct. at 786).

Finally, when a federal court is analyzing a claim under the standard set forth in § 2254(d), its review is limited to the record that was before the state court when it adjudicated the claim.  As the Supreme Court recently reiterated:

> Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so.  Provisions like §§ 2254(d)(1) and (e)(2) ensure that "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings."  [*Williams*, 529 U.S. at 437; *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 787 (2011)] ("Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions"); *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S. Ct. 2497, 53 L.Ed.2d 594 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing").

*Pinholster*, 131 S. Ct. at 1401-03.

B.  Exhaustion

A provision of the federal habeas corpus statute, 28 U.S.C. § 2254(b), requires a state prisoner to exhaust available state court remedies before seeking federal habeas

---

[8]     Regardless of whether a state court had adjudicated a claim on the merits so as to invoke review under the standard set forth in § 2254(d), a federal habeas court must presume that all state-court *factual findings* are correct unless the presumption is rebutted by clear and convincing evidence.  *See Palmer v. Hendricks*, 592 F.3d 386, 392 (3d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)).

corpus relief. Specifically, a federal habeas court may not grant a state prisoner's petition for writ of habeas corpus unless he has first presented his federal constitutional claims to the state courts. 28 U.S.C. § 2254(b)(1)(A). This is called the "exhaustion" requirement and it is "grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." *Coleman*, 501 U.S. at 731. *See also O'Sullivan*, 526 U.S. at 842-49. In order to exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45 (emphasis added). In Pennsylvania, this requirement means that a petitioner in a non-capital case must have presented every federal constitutional claim raised in his habeas petition to the Superior Court either on direct or PCRA appeal. *See*, *e.g.*, *Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004).

C. Procedural Default

Significant to these proceedings, like the exhaustion requirement, a federal court may be precluded from reviewing claims under the "procedural default doctrine." *Gray v. Netherland*, 518 U.S. 152 (1996); *Coleman v. Thompson*, 501 U.S. 722, 732 (1991); *Doctor*, 96 F.3d at 678; *Sistrunk v. Vaughn*, 96 F.3d 666, 678 (3d Cir. 1996). Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system. A state's procedural rules are entitled to deference by federal courts, and a habeas petitioner may not have his claim reviewed if his violation of a state procedural rule constitutes an independent and adequate state law ground for

denial of a federal habeas claim.[9]  *Sistrunk*, 96 F.3d at 673.  That is to say that the state court decision involving a question of federal law is based on state law that is "independent" of the federal question and "adequate" to support the judgment. *Coleman*, 501 U.S. at 750.

Moreover, violations of a state's procedural rules may constitute an independent and adequate state ground sufficient to invoke the procedural default doctrine even where no state court explicitly has concluded that a petitioner is procedurally barred from raising his claims.  *Glass v. Vaughn*, 65 F.3d 13, 15 (3d Cir. 1995), *cert. denied*, 516 U.S. 1151 (1996); *Carter*, 62 F.3d at 595.  However, in that case, the procedural default doctrine only applies when a state procedural rule is consistently or regularly applied.  *Banks v. Horn*, 126 F.3d 206, 211 (3d Cir. 1997) (quoting *Johnson v. Mississippi*, 486 U.S. 578, 588-89 (1988)).[10]

A petitioner whose constitutional claims have not been addressed on the merits due to a procedural default can overcome the default, thereby allowing federal court review, if he or she can demonstrate either: 1) "cause" for the default *and* "actual prejudice" as a result of the alleged violation of federal law; or 2) failure to consider the

---

[9]     State procedural grounds for denying a PCRA claim include, but are not limited to, the PCRA's timeliness requirement, 42 Pa.C.S. § 9545(b), failing to adequately develop the claim in one's briefing, *Commonwealth v. Bracey*, 795 A.2d 935, 940 n. 4 (Pa.2001); Pa. R .A.P. 2116, 2119(a), and presenting a claim on appeal without having presented it to the lower court, *Commonwealth v. Wharton*, 811 A.2d 978, 990 (Pa.2002); Pa. R.A.P. 302(a).

[10]    *See also Doctor*, 96 F.3d at 675 (the state rule must be firmly established and regularly followed before it can be considered an independent and adequate state law ground sufficient to foreclose federal court review under the procedural default doctrine).

claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Carter*, 62 F.3d at 595.

To satisfy the cause standard, a petitioner must demonstrate that some objective factor external to the defense impeded his or her efforts to raise the claim in state court. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To show prejudice, a petitioner must demonstrate that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions, not merely that the error created a "possibility of prejudice." *Carrier*, 477 U.S. at 494. Where a petitioner cannot make a showing of "cause and prejudice," a federal court may nevertheless consider the merits of his or her unexhausted claims under circumstances in which the failure to adjudicate such claims would result in a "fundamental miscarriage of justice."[11] *Coleman*, 501 U.S. at 750.

D. *Martinez v. Ryan*, 132 S. Ct. 1309 (2012)

As will be revealed throughout this Opinion, most of Rega's habeas claims are procedurally defaulted and thus barred from habeas review. However, to the extent he

---

[11] Although Rega does not argue this exception to the procedural default doctrine, it is worth noting that this exception is based on the principle that, in certain circumstances, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Carrier*, 477 U.S. at 495 (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)). The "prototypical example" of a miscarriage of justice is a situation in which an underlying constitutional violation has led to the conviction of an innocent defendant. *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992). In that instance, the merits of a petitioner's claims can be considered notwithstanding his or her failure to raise them before the state courts.

acknowledges such default, he argues that, pursuant to *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), he has established the necessary "cause" to excuse it.

In *Martinez*, the United States Supreme Court carved out a "narrow exception" to the well-established rule that alleged errors by post-conviction counsel cannot be the basis for showing "cause" for a procedural default because there is no federal constitutional right to counsel on post-conviction review. *See Coleman v. Thompson*, 501 U.S. 722, 750-52 (1991); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). However, the Supreme Court held that ineffectiveness of post-conviction counsel in failing to properly raise the ineffectiveness of trial counsel during "initial-review collateral proceedings" can be used to show cause for procedural default when said collateral proceedings were the first place the petitioner could raise such a claim.[12] *Martinez*, 132 S. Ct. at 1315-17.

For two reasons, *Martinez* does not provide Rega with "cause" to excuse the default of his claims. First, as will be discussed in relation to some of Rega's claims, the

_____

[12]     The Court summarized the two situations in which a petitioner may establish cause for a default of an ineffective assistance claim:

> The first is where the state courts did not appoint counsel in the initial-review collateral proceedings for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984).

*Id*. at 1318. In addition to proving that one of those two situations applies, the petitioner "must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id*. With respect to what constitutes a "substantial" claim, the Court suggested, by citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificate of appealability to issue), that courts should apply the standard for issuance of a certificate of appealability.

first time Rega was allowed to raise ineffective assistance of counsel claims was not in his initial post-conviction proceedings, but rather in his post-sentence motions. Rega was afforded a hearing on his claims, including his ineffective assistance of counsel claims, and they were reviewed by the trial court and the Pennsylvania Superior Court on direct appeal. Therefore, Rega does not fall into the *Martinez* exception because his initial post-conviction proceeding was not the first time he could raise his ineffective assistance of trial counsel claims.

Second, and most important, during his first PCRA proceedings, Rega clearly and unequivocally waived his right to counsel and elected to proceed *pro se*. Therefore, any procedurally defaulted ineffective assistance of counsel claim was the result of Rega's own hand.

Rega, however, contends that any procedural default of his claims at the initial-review collateral proceedings should be excused because he was either "unrepresented" or had "ineffective representation" during his first PCRA proceedings. In sum, he claims that he only waived his right to PCRA counsel because his appointed counsel, Attorney Vrobel, failed to represent him adequately during the five month period between the time he was appointed and the time he was discharged.

In determining whether *Martinez* is applicable to Rega in this scenario, the threshold question is whether Rega has rebutted by clear and convincing evidence the state court's finding that he knowingly, intelligently, and voluntarily waived his right to the appointment of PCRA counsel. *See Fahy v. Horn*, 516 F.3d 169, 181 (3d Cir. 2008) ("Here, the state court's explicit factual finding that Fahy was competent is presumed correct, unless Fahy rebuts 'the presumption of correctness by clear and convincing

evidence.'") (citing § 2254(e)(1)); *see also Figueroa v. Vaughn*,   (E.D. Pa. Sept. 9, 2005) ("AEDPA, however, obligates this court to presume that a factual determination made by the state court [as to waiver of counsel] is correct unless the petitioner can rebut that presumption by clear and convincing evidence.") (citing 28 U.S.C. § 2254(e)(1)).

This question was examined in detail and thoroughly answered by the Pennsylvania Superior Court in its Opinion on Rega's first PCRA appeal.  We need not expand on their well-reasoned analysis any further but will instead set forth the relevant portion of that Opinion herein.

> Here, when notified of the appointment of PCRA counsel by the trial court, appellant immediately wrote to the trial judge in order to reject the appointment of counsel and to further declare his intention to proceed *pro se*.  That letter was made part of the certified record and forwarded to appointed PCRA counsel, who thereafter took no further action as counsel for appellant.  The trial court, however, proceeded as if the appointment was still valid, and forwarded the answer of the Commonwealth to PCRA counsel.  Appellant continued to oppose the appointment of counsel and, on January 5, 2007, filed a motion for self representation.  On January 9, 2007, the trial court, pursuant to Pennsylvania Rule of Criminal Procedure 907, entered a notice of its intention to dismiss appellant's *pro se* petition without a hearing.  Appellant, upon receiving the Rule 907 notice, sent two letters, dated January 9, 2007, and January 12, 2007, to the trial court and demanded a colloquy upon the waiver of counsel.

> The trial court, on February 12, 2007, convened a hearing at which appellant participated by telephone.  The trial judge (1) advised appellant of his right to counsel in the preparation of his PCRA petition, (2) informed appellant of his right to amend, or have amended, his PCRA petition, (3) offered appellant the option of having the court reissue the notice of intent to dismiss the *pro se* petition in order to permit him to amend the petition in response to the Commonwealth's answer, (4) informed appellant of the risks of proceeding *pro se*, and (5) informed appellant of his right to counsel in the appeal from the denial of post conviction relief.  Appellant informed the trial court that he was aware of his rights and the risks of proceeding *pro se*, and that he intended to proceed *pro se* with regard to the PCRA petition and the appeal from the denial of the petition.

Appellant further stated that he did not want the trial court to reissue the notice of its intention to dismiss his *pro se* PCRA petition. Thereafter, the trial court, on February 27, 2007, entered the order dismissing appellant's *pro se* petition.

Thus, the record belies appellant's contention that the colloquy conducted by the court was insufficient to apprise appellant of his right to counsel and the risks of rejecting the appointment of counsel. Appellant's further claim that his waiver was induced by the ineffectiveness of PCRA counsel is patently meritless, ***since appellant clearly, unequivocally, and consistently made known his rejection of the appointment of counsel***. Accordingly, appellant's present efforts to reopen the PCRA proceeding based upon allegations that he was denied the right to counsel must fail . . . .

(Resp't Ex. P, Pa. Super. Ct. Op. and Order, Aug. 22, 2005, ECF No. 35-3 at pp.7-10)

(footnotes omitted) (emphasis added).

Rega has clearly not provided clear and convincing evidence to rebut the state court's finding of fact, which is entitled to deference under § 2254(e), that he "clearly, unequivocally, and consistently made known his rejection of the appointment of counsel." *Id*. As the foregoing makes abundantly clear, Rega was going to waive his right to PCRA counsel no matter who the court was going to appoint. Furthermore, he ***immediately*** and ***repeatedly*** demanded that Attorney Vrobel be removed from his case, stating that he was not going to recognize him as his counsel and that he wanted him to keep his "mitts" off of his case. There can be no question that the only person who can be charged with "cause" for any defaulted ineffective assistance of trial counsel claim is Rega himself. In this regard, *Martinez* does not apply to him. *See Haggie v. Coleman*, No. 13-320E, 2014 WL 5795602, at *8 (W.D. Pa Oct. 6, 2014) (*Martinez* does not apply because "[a]ny failure to properly raise and brief his PCRA claims is attributable solely to Petitioner[] since he was proceeding *pro se*."); *Kollock v. Glunt*, No.

13-656, 2014 WL 4080757, at *25 (E.D. Pa Aug. 18, 2014) (*Martinez* does not apply because petitioner elected to proceed *pro se*).

Because we find that *Martinez* does not provide Rega with "cause" to excuse the procedural default of his ineffective assistance of trial counsel claims, we will not continue to reiterate our reasoning every time Rega makes this argument in relation to each claim.

E. Ineffective Assistance of Counsel

In almost every one of his claims, Rega raises allegations of ineffective assistance of counsel; whether it is trial, appellate or postconviction. The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." *Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993) (quoting *Strickland v. Washington*, 466 U.S. 668, 684 (1984)). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: (1) counsel's performance was unreasonable; and (2) counsel's unreasonable performance actually prejudiced the defense. *Strickland*, 466 U.S. at 687. To determine whether counsel performed below the level expected from a reasonable competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. *Id*. at 690.

The first prong of the *Strickland* test requires a defendant to establish that his or her attorney's representation "fell below an objective standard of reasonableness" by committing errors "so serious" that he or she "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687-88. A court must indulge in a "strong presumption" that counsel's conduct falls within the "wide range" of

reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." *Id*. at 689. The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the relevant time and place. *Id*.

The second prong requires a defendant to demonstrate that counsel's errors deprived him or her of a fair trial and the result was unreliable. *Id*. at 687. To prove prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Id*. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693.

Representation is constitutionally ineffective only if it "so undermined the proper functioning of the adversarial process" that the defendant was denied a fair trial. *Id*. at 686. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington*, 131 S. Ct. at 791. While in some instances "an isolated error" can support an ineffective-assistance claim if it is "sufficiently egregious and prejudicial," it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy. *Id*. (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

> "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485 (2010). An ineffective-assistance claim can function as a way to escape rules of

waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S. at 689-90. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id*., at 689; see also *Bell v. Cone*, 535 U.S. 685, 702 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland,* 466 U.S., at 690.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and §2254(d) are both "highly deferential," *id*., at 689; *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at 123, 129 S. Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 131 S. Ct. at 788.

Courts may not indulge "*post hoc* rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions. *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003). There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (*per curiam*). "After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to

magnify their own responsibility for an unfavorable outcome.  *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."  *Harrington*, 131 S. Ct. at 790 (citing *Strickland*, 466 U.S. at 688).

IV.    **Rega's Habeas Claims**

On April 5, 2012, Rega filed his amended petition for writ of habeas corpus raising twelve (12) claims, and on July 20, 2012, Rega filed a supplement to his amended habeas petition raising one (1) additional claim.  He asserts the following thirteen (13) grounds for relief:

Claim 1     Mr. Rega was denied due process and the right to confront his accusers when the Commonwealth suppressed favorable evidence that was material to his ability to present a defense at trial and to undermine the credibility of the key Commonwealth witness.

Claim 2     Mr. Rega was denied due process, the right to confront accusers and effective assistance of counsel when the Commonwealth not only failed to correct false and misleading testimony offered by and in support of the Commonwealth's key witnesses, but also made false and misleading representations to the court and the jury, and trial counsel failed to object to known misrepresentations.

Claim 3     Mr. Rega was denied due process and the right to confront his accusers as a result of the cumulative effect of all suppressed and false and misleading evidence under *Brady* and *Napue*.

Claim 4     Mr. Rega was denied due process, the right against self-incrimination, counsel, and effective assistance of counsel when the Commonwealth improperly impeached the key defense witness without challenge by trial or appellate counsel.

Claim 5     Mr. Rega was denied effective assistance of counsel when trial counsel failed to timely locate and adequately interview, prepare and present a key defense witness.

Claim 6          Mr. Rega was denied due process, proof of guilt beyond a reasonable
                 doubt, a unanimous jury verdict on all counts and effective assistance of
                 counsel when he was convicted of multiple sex offenses based on generic
                 and nonspecific testimony.  All prior counsel failed to litigate this issue.

Claim 7          Mr. Rega was denied due process, protection against double jeopardy and
                 the effective assistance of counsel because he was deprived of notice of
                 the specific charges against him and his right to present a defense.  All
                 prior counsel failed to litigate this issue.

Claim 8          Mr. Rega was denied effective assistance of counsel when trial counsel
                 unsuccessfully attempted to prove Mr. Rega's exculpatory genital
                 abnormality through the testimony of a witness who did not have
                 knowledge of the relevant issue.

Claim 9          Mr. Rega was denied his right against cruel and unusual punishment
                 when he was sentenced to a maximum of 354 years imprisonment, a
                 penalty that is grossly disproportionate to the offenses for which he was
                 convicted.

Claim 10         Mr. Rega was denied due process and effective assistance of counsel
                 when the trial court refused to grant a mistrial after Susan Jones told th[e]
                 jury that Mr. Rega had been involved in a homicide and trial and appellate
                 counsel failed to further object to this due process violation.

Claim 11         All prior counsel were ineffective for failing to investigate and litigate the
                 issues presented in this amended petition.

Claim 12         Mr. Rega was denied due process because of the cumulative prejudicial
                 effect of the error in this case.

Claim 13         Mr. Rega was denied effective assistance of counsel because trial counsel
                 failed to effectively impeach the complaining witnesses.

(Pet'r Am. Pet. for Writ of Habeas Corpus, ECF No. 21); (Pet'r Supp. to Am. Pet. for

Writ of Habeas Corpus, ECF No. 25.)  We will now proceed to address Rega's claims in

the order in which they are presented.


**V.     Discussion**

(1) <u>Mr. Rega was denied due process and the right to confront his accusers when the Commonwealth suppressed favorable evidence that was material to his ability to present a defense at trial and to undermine the credibility of the key Commonwealth witness.</u>

In this claim Rega contends that the Commonwealth violated *Brady v. Maryland*, 373 U.S. (1963), by suppressing evidence of plea negotiations with Commonwealth witness Susan Jones ("Jones").[13] It was the defense's theory at trial that Jones had orchestrated the allegations of the victims in order to curry favor with law enforcement because she had at least three open criminal cases pending against her, two of which were felonies, and she was facing jail time for those crimes.[14] Rega argues that it would have cast significant doubt on the Commonwealth's entire case and the credibility of the victims had it been disclosed to the jury that Jones had a "verbal agreement" with the Commonwealth that she would receive probation for her various criminal charges if she testified against him.

(a) <u>Procedural Default</u>

This claim is procedurally defaulted. The first time Rega raised this claim was *after* he had filed his *pro se* appellate brief in his appeal from the denial of his first PCRA petition. Specifically, it was raised by Attorney Lebovitz in Rega's supplemental

---

[13] Jones had previously implicated Rega in the Gateway Lodge homicide and robbery, and subsequently testified against him in that case.

[14] *Commonwealth v. Susan I. Jones*, CP-33-CR-345-2001 (C.P. Jefferson Co.) (burglary and related charges), CP-33-CR-346-2001 (C.P. Jefferson Co.) (drug related charges), CP-33-CR-48-2003 (C.P. Jefferson Co.) (conspiracy to commit robbery). Jones was later charged with welfare fraud at *Commonwealth v. Jones*, CP-33-CR-248-2003 (C.P. Jefferson Co.). On February 18, 2004, and pursuant to a plea deal with the Commonwealth, Jones pled guilty to one count in each of the cases pending against her and the remaining charges were *nolle prossed*. She was sentenced thereafter to fifteen (15) years of probation. (Pet'r Ex. 6, C.P. Jefferson Co. Docket Sheets, ECF No. 21-7.)

petition to remand, wherein he alleged that the Commonwealth had committed a *Brady*

violation by withholding evidence of plea negotiations with Jones. In the petition to

remand, Attorney Lebovitz also argued that Attorney Daghir (appellate counsel) and

Attorney Vrobel (first PCRA counsel) rendered ineffective assistance by failing to litigate

the *Brady* violation claim. Attorney Lebovitz argued that Rega was entitled to a remand

or expansion of the record because the PCRA court conducted an inadequate colloquy

before granting Attorney Vrobel leave to withdraw and because Attorney Vrobel's

ineffectiveness vitiated Rega's decision to proceed without counsel. The Superior Court

flatly rejected Attorney Lebovitz's attempt to reopen Rega's first PCRA proceedings,

stating that Rega "clearly, unequivocally, and consistently made known his rejection of

the appointment of counsel." (Resp't Ex. CC, Pa. Super. Ct. Op. and Order, May 22,

2008, ECF No. 35-3 at pp.9-10.)

This claim was raised again in Rega's third PCRA petition, which the PCRA court

found untimely pursuant to Pennsylvania's one-year PCRA statute of limitations, 42

Pa.C.S.A. § 9545(b). *See* Section II.E., *supra*; (Resp't Ex. NN, C.P. Jefferson Co. Op.

and Order, Oct. 12, 2010, ECF No. 40-1.) The Superior Court agreed on appeal that

the petition was untimely. *See* Section II.E., *supra*; (Resp't Ex. WW, Pa. Super. Ct. Op.

and Order, Nov. 18, 2011, ECF No. 46-1.) Accordingly, we may not consider the merits

of this claim unless Rega establishes an exception to the procedural default rule.[15] He

---

[15]     Because the Superior Court denied the claims in Rega's third PCRA petition as
untimely, they are procedurally defaulted. The procedural default doctrine prohibits
federal habeas courts from reviewing a state court decision involving a federal question
if the state court decision is based on a rule of state law that is independent of the
federal question and adequate to support the judgment. <u>See</u>, <u>e.g.</u>, <u>Gray v. Netherland</u>,
518 U.S. 152, 162 (1996); <u>Coleman</u>, 501 U.S. at 732. A state rule of procedure is

argues that because he either had no counsel during his initial PCRA proceedings or because PCRA counsel abandoned him during his initial PCRA proceedings, under the principles of *Martinez* he has shown "cause" for the procedural default. However, we have already explained why *Martinez* is inapplicable to Rega. *See* Section III.D., *supra*. Thus, the claim is not subject to habeas review and is denied as procedurally defaulted.

(b) Merits

Although this claim is procedurally defaulted, we find that it is without merit as well. We note that this *exact* claim was raised in Rega's capital case (Gateway Lodge homicide) PCRA petition; and after conducting a lengthy evidentiary hearing, the PCRA court found *as fact* that the District Attorney (DA Burkett) did not "promise[] nor foster[] the expectation of leniency" with respect to any witness, **including Jones**, and "had nothing to disclose [to the defense] in that regard". (Resp't Ex. QQ, C.P. Jefferson Co. Op. and Order, Oct. 27, 2011, ECF No. 41-1); *Commonwealth v. Rega*, No. CP-33-CR-26-2001, at p. 20 (C.P. Jefferson Co. Oct. 27, 2011) (emphasis added).

Both Rega and the Commonwealth extensively discuss in their briefs the Gateway Lodge homicide and what occurred in the litigation of Rega's PCRA claims in

---

"independent" if it does not depend for its resolution on answering any federal constitutional question. *See*, *e.g.*, *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985). That is the case here, since the Superior Court's decision was based on the application of a state statute of limitations rule. It was also "adequate." A state rule is "adequate" if: (1) the state procedural rule was sufficiently clear at the time of the default to have put the petitioner on notice of what conduct was required; (2) the state appellate court reviewing the petitioner's claim refused to review it on the merits because the petitioner failed to comply with the rule; and (3) the state court's refusal was consistent with other decisions. *Shotts v. Wetzel*, 724 F.3d 364, 370 (3d Cir.2013); *Nara v. Frank*, 488 F.3d 187, 199 (3d Cir.2007). *See also Beard v. Kindler*, 558 U.S. 53 (2009) (discretionary state rules can be "adequate"); *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991) (a state procedural rule is "adequate" if it is "firmly established and regularly followed" at the time that the alleged procedural default occurred).

that case. Rega contends that the testimony of Jones and her attorney at that hearing, as well as the documents introduced at the hearing, confirmed that Jones had an understanding with the Commonwealth that she would receive probation in exchange for her testimony against Rega in this case as well as his capital case. This is representation of the testimony at that hearing is disingenuous.

As background, Jones was represented in her criminal matters by Attorney Timothy Morris ("Attorney Morris"). The crux of the instant claim is that prior to Rega's capital trial, Attorney Morris attended a Criminal Conference with DA Burkett[16] and that following the conference Attorney Morris walked out and told Jones that there "was possibly a verbal agreement" that she would end up with probation if she testified against Rega and his co-defendants.

Rega relies on an exchange of letters between Jones and Attorney Morris to support his claim. In a letter from Jones to Attorney Morris dated February 27, 2002, three months before Rega's capital trial, Jones asks why Attorney Morris continued her cases until June of 2002 if she was only supposed to get probation. Specifically, she wrote, "Than why the postponement, is there a change in the verbal conformation [sic] or the words more than likely, which isn't binding such as a verbal agreement? . . . ." (Pet'r Ex. 8, Letter dated Feb. 27, 2002, ECF No. 21-9.) Attorney Morris replied to Jones in a letter dated March 6, 2002, stating, "As far as I know there is no change in the 'verbal confirmation', which I presume you mean to be the proposed plea agreement. If you wish to withdraw the possibility of a plea agreement, please let me

---

[16] According to Jones, other individuals were in the meeting but she did not know who they were. However, the record leads us to believe that these individuals were attorneys for Rega's co-defendants.

know and I will have your case put on the trial list as soon as possible." (Pet'r Ex. 10, Letter dated Mar. 6, 2002, ECF No. 21-11.)

Importantly, Jones testified at Rega's capital PCRA hearing on December 17, 2009. On direct examination by Rega's attorneys, she testified that there "was possibly a verbal agreement" reached at the Criminal Conference between Attorney Morris and DA Burkett on September 5, 2001,[17] so she fully expected to receive probation after she had testified against Rega. However, when asked specifically what Attorney Morris said to her, she stated, "He pretty much didn't say a whole lot, it was just the way he said things and that was the feeling I got, that I was going to end up with just probation." (Tr. of Hr'g, Dec. 17, 2009, CP-33-CR-26-01&524-01 at pp.141-142).

On cross, however, she testified that she told the truth at both of Rega's trials when she testified to the fact that no deals had been made or promised to her in exchange for her testimony. She also agreed that when she testified at Rega's rape trial she had testified truthfully to the fact that she had pending criminal charges against her that had not yet been disposed of, that no charges had been dropped against her, that she did not know why she was out of jail at that time, that it was a good possibility she could get 20 years for her robbery charge, and that she was fully expecting to get "jail time" for her offenses. *Id*. at pp.186-90. When she was asked about the inconsistency between what she stated on direct, she said that ". . . Anything I said [at the trials] was true." After having reviewed her prior testimony from Rega's trials, she

---

[17]     During Attorney Morris' testimony at Rega's capital PCRA hearing, it was determined that this Criminal Conference occurred on September 5, 2001. (Tr. or Hr'g, Dec. 14, 2009, CP-CR-26-01&524-01 at pp.180-81).

testified that she fully believed she was going to go to jail for her crimes and was not expecting probation. *Id*. at pp.190-91.

Attorney Morris also testified at Rega's capital PCRA proceedings in reference to alleged plea negotiations with the Commonwealth. When questioned about this subject, Attorney Morris had little memory as to representing Jones but stated that had there been a formal plea offer, he would have written the terms down in his file. (Tr. of Hr'g, Dec. 14, 2009, CP-33-CR-26-01&524-01 at pp.192-95). He testified that his file for Jones indicated that "the first of any discussion about an offer" would have been at a Criminal Conference that was held on July 16, 2003, two months *after* Rega's rape trial. *Id*. This was documented in Attorney Morris' file as follows:

> I'm going to make an offer on all three cases at the next criminal conference. However, D.A. knows defendant has completed restitution with the letter today $790. Defendant will accept house arrest. Don't forget to mention her son . . . . Her one hundred percent cooperation with the Commonwealth even went to Huntingdon.

*Id* at pp.193-94. Attorney Morris testified that these were the "pitches" that he made on behalf of Jones during his negotiations with the Commonwealth. *Id*. at p.194. Significantly, the notation in Morris' file indicates that plea negotiations for Jones' cases did not occur until *after* Rega's trials were over and begs the question of why he would make a pitch for his client to receive house arrest if DA Burkett had already made an informal promise of probation. Ultimately, Jones received a formal plea offer from DA Burkett on January 28, 2004. *Id*. at pp.196-97

On October 27, 2011, the Court of Common Pleas of Jefferson County, acting as the PCRA court in Rega's capital case, issued a very lengthy Opinion on Rega's PCRA petition. With respect to Jones, the PCRA court stated as follows:

As for Jones'[] understanding that she would receive probation, the record does not support the proposition that the Commonwealth was responsible for her belief.  According to Jones, Morris emerged from an early criminal conference with the news that they had a "possible verbal agreement" for probation if she testified against Rega.  She quickly noted, however, that Morris in fact did not say a whole lot, but that she got the impression from the way he talked that probation was a real possibility.  The Court knows from Morris's testimony, however – testimony that coincided with Taladay and Inzana's statements regarding Burkett's policy – that Burkett was not negotiating Jones'[] cases at that point in time.  The Court can reasonably conclude, therefore, that Morris's indication of a "possible verbal agreement" developed from his own hopes and expectations rather than from an actual discussion with Burkett.

. . . .

To the extent that Rega's co-defendants believed they would receive leniency in exchange for their cooperation, then, that expectation stemmed from their attorneys' ill-advised statements or their own subjective ideas of what their cooperation would get them. . . .  Likewise with Susan Jones: if at some point in time she was fully expecting to receive a probation sentence, it was because of something her attorney said or that she errantly inferred.  In none of these cases, though, did the Commonwealth foster the notion that any of them would receive any level of leniency, let alone a specific deal, in exchange for their cooperation.  Rather, Burkett conveyed nothing more than that he would "probably" take any cooperation into account when later considering plea deals.

(Resp't Ex. QQ, C.P. Jefferson Co. Op. and Order, Oct. 27, 2011, ECF No. 41-1);

*Commonwealth v. Rega*, No. CP-33-CR-26-2001, at pp. 21, 24 (C.P. Jefferson Co. Oct. 27, 2011)).

As previously noted, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence.  28 U.S.C. § 2254(e).  Rega has failed to do so in his petition by showing there was a plea deal between Jones and the Commonwealth.[18] [19]

---

[18]    We recognize that this claim was disposed of on the merits in Rega's capital PCRA proceedings but not his PCRA proceedings in this case because the PCRA court

Nonetheless, despite Rega's contentions to the contrary, we fail to see the magnitude of Jones' testimony. We agree with Respondent's position that this case rose and fell with the credibility of the victims, not Jones. Jones' only involvement in the underlying incident was calling the state police to relay the victims' allegations. All four victims independently testified against Rega, and the jury credited their testimony over the defense's theory that Jones convinced the victims to lie in order to gain leverage with the Commonwealth. While it is possible that these crimes may never have been brought to light had it not been for Jones' involvement, the manner in which they were exposed does not in any way alter the reality that they occurred. Indeed, this was demonstrated at trial by testimony from the victims implying that most, if not all of the sexual encounters between them and Rega were effectively consensual.

In addition, the jury was made well aware of Jones' pending criminal charges, the severity of them, the fact that they had yet to be disposed of and the fact that she had

_____

found the claim untimely. Nevertheless, the two claims are identical and were disposed of by the same judge in the same court who presided over both of Rega's trials. Rega's counsel even cites to portions of the capital case PCRA hearing in Rega's amended habeas petition. Therefore, as related to this claim, we will apply the standard of correctness afforded to a state court's factual findings – *i.e.*, the PCRA court's findings in Rega's capital case.

[19]    In instances where a state court has not adjudicated a claim on the merits, the deference normally required by § 2254 does not apply and the federal habeas court applies *de novo* review to pure legal questions and to mixed questions of law and fact. *See Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009); *Thomas v. Varner*, 428 F.3d 491, 497 (3d Cir. 2005). *See also Williams v. Superintendent, SCI Greene*, No. 11-cv-4319, 2012 WL 6057929, at *1 n.4 (E.D. Pa. Dec. 04, 2012) (applying *de novo* review to a claim of cumulative error that the state courts had not considered). Even on *de novo* review of a habeas claim, the state court's factual determinations are still presumed to be correct, unless a petitioner rebuts them with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

not yet served any time in jail.[20]  The jury could have reasonably inferred from this information, particularly the length of time that had elapsed since Jones was charged with her crimes, that the Commonwealth was strategically using Jones for her testimony, and, their lack of any explanation for why Jones' pending criminal charges had yet to be disposed of could very well have been damning to the Commonwealth. Given this lack of explanation, yet obvious strategy by the Commonwealth, a reasonable juror would have likely questioned the reliability of Jones' testimony, or, more likely, deduced that her cooperation with the Commonwealth was certainly going to be taken into consideration when she was sentenced.  Thus, defense counsel's repeated emphasis on this subject at trial most likely raised a question as to whether the Commonwealth had an actual deal with Jones, which possibly discredited her testimony in the minds of the jury.  However, it was not enough to discredit the testimony of the victims; and, most significantly, we again note that Rega has not met his burden to show the existence of any plea deal between the Commonwealth and Jones prior to his trial.

For the aforementioned reasons, we first find that this claim must be denied because it is procedurally defaulted; and, in the alternative, it is without merit.

(2) <u>Mr. Rega was denied due process, the right to confront accusers and effective assistance of counsel when the Commonwealth not only failed to</u>

---

[20]     On cross-examination, Jones was asked about her pending charges, including: drug charges from drugs and drug paraphernalia found in her house, (Resp't Ex. D, Jury Trial Tr., May 5, 2003, ECF No. 28-2 at pp.47-52); burglary, *id*. at p.63; and robbery, *id*. at p.71.  She was also questioned about possible crimes for which she could be charged, including assisting in disposing of a gun used in the Gateway Lodge homicide, *id*. at pp. 64-65, 68; receiving stolen property (money taken during the homicide), *id*. at p.70; and making at least three false statements to the police, *id*. at p.62.  Jones also admitted to being on unsecured bail in all of her cases.  *Id*. at p.71.

<u>correct false and misleading testimony offered by and in support of the Commonwealth's key witnesses, but also made false and misleading representations to the court and the jury, and trial counsel failed to object to known misrepresentations.</u>

Rega raises five subparts within this one claim. He alleges that the Commonwealth failed to correct (or purposefully elicited) material misrepresentations that Susan Jones: (1) was not an uncharged accomplice to the homicide at Gateway Lodge; (2) was not involved in disposing of the gun used in the homicide; (3) was not involved in plea negotiations with Commonwealth representatives at the time of Rega's trial; (4) was expecting to face prosecution in multiple criminal charges after Rega's trial; and (5) was expecting to be found guilty and incarcerated for at least twenty (20) years on those pending charges. It is alleged that the Commonwealth mislead the jury about Jones' role in Rega's murder case through her testimony and also through the testimony of Trooper Davis.[21]

(a) <u>Procedural Default</u>

Subparts 1 and 2 of this claim are procedurally defaulted because they were raised in the first instance by Rega's appellate counsel (Attorney Daghir) in the post-sentence motion dated February 5, 2004 in *terms of trial counsel ineffectiveness* "for failing to object and request a mistrial" when Trooper Davis testified "that he did not have any evidence to charge Susan Jones as an accomplice in a homicide," or have sufficient evidence "to charge Susan Jones with the destroying of evidence (the gun), when he had or should have been aware of such evidence, and that this was done so as to extenuate Mrs. Jones' culpability, and rehabilitate her credibility with the jury."

---

[21] Subparts 3-5 of this claim essentially reiterate the same allegations as those raised in claim one.

(Resp't Ex. F, Post Sentence Mot., Feb. 5, 2004, ECF No. 29-2 at pp.7-8.)  On direct appeal, the claims were again raised as ineffective assistance of counsel claims.[22] (Resp't Ex. P, Pa. Super. Ct. Op. and Order, Aug. 22, 2005, ECF No. 32-3.)

In his amended habeas petition, Rega does not present subparts 1 and 2 as he presented them to the state courts – *i.e.*, as ineffective assistance of counsel claims. Instead, he spends most of the portion of his brief dedicated to this claim outlining the testimony that he believes DA Burkett knew was blatantly false and misleading.

The first time Rega raised subparts 1 and 2 in the state courts in their current form was in Rega's third PCRA petition (as Claim II).  (Resp't Ex. II, Third PCRA Pet., Mar. 26, 2009, ECF No. 38-1 at pp.73-104.)  However, as noted in Section II.E. of this Opinion, the state courts determined that Claim II in the third PCRA petition was untimely under the PCRA.  *See* Section II.E., *supra*; (Resp't Ex. NN, C.P. Jefferson Co. Op. and Order, Oct. 12, 2010, ECF No. 40-1); (Resp't Ex. WW, Pa. Super. Ct. Op. and Order, Nov. 18, 2011, ECF No. 46-1.)  Therefore, as they are presented and argued in Rega's amended habeas petition, subparts 1 and 2 to this claim (as well as 3-5) are procedurally defaulted.[23]  Accordingly, we may not consider the merits of this claim unless Rega establishes an exception to the procedural default rule.  Again he relies on

---

[22]     In his post-sentence motions, when Rega actually raised these claims in the state court as trial court ineffectiveness issues, they were fully developed at a hearing on April 28, 2004, denied, and thereafter raised for appellate review.  To the extent he is raising any of these ineffective assistance of counsel claims that he raised on direct appeal, Rega has not overcome the standard of review this Court must afford to the state court adjudication.  Thus, he is not entitled to habeas relief under § 2254(d).

[23]     Because subparts 3-5 of this claim essentially reiterate the same allegations as those raised in claim one, our findings regarding procedural default as addressed in claim one apply equally to subparts 3-5 raised in this claim.

*Martinez* and the arguments he made in relation to claim one, but we find that this does not establish "cause" for the default of this claim. *See* Section III.D., *supra*. Thus, the claim is denied as procedurally defaulted and not subject to habeas review.

       (b) <u>Merits</u>

Nevertheless, for the reasons previously discussed in claim one and outlined below, we find that this claim, in its entirety, has no merit.

According to Rega, the evidence Trooper Davis allegedly had, or should have been aware of, consisted of:

(i)      An accomplice jury charge with respect to the testimony of Susan Jones in Rega's homicide trial at No. 26-2001.

(ii)     Jones' testimony at Rega's homicide trial on June 15, 2002, that she went with her husband to dispose of the gun; she was aware that the gun was used in the homicide; she vacuumed the metal filings left after grinding the safe; she babysat Rega's children with knowledge that Rega and his co-defendants were leaving to commit a crime and that they possessed a gun; she admitted to knowingly misleading the police on numerous occasions to cover for her husband; she benefited from the money taken during the homicide/robbery; and she procured a garbage bag to pick papers up off the floor that were in the safe.

(iii)    She had given a statement on a Pennsylvania State Police form indicating that she accompanied her husband when he disposed of the gun.

(iv)    Her husband, Stanford Jones wrote 2 letters, one dated July 19th and the second post marked June 25th, implicating his wife in the homicide robbery and disposing of the gun.

*Id*.

Additionally, at the hearing on the post-sentence motions, Rega amended his motion to include a claim that Trooper Davis gave, and DA Burkett knowingly solicited perjured testimony. (Resp't Ex. M, Post Sentence Hr'g Tr., Apr. 28, 2004, ECF No. 31-2

at pp.48-52.)  Trooper Davis' testimony that Rega claims was perjured is when he was

asked the following questions:

> Q:     Did you have any evidence to charge Susan Jones as an
>        accomplice in a homicide?
>
> A:     No, I do not.
>
> Q:     Did you have sufficient evidence to charge her with getting rid of
>        the handgun?
>
> A:     No, I did not.
>
> Q:     What about her husband?
>
> A:     Yes.

(Resp't Ex. E, Jury Trial Tr., May 6, 2003, ECF No. 29-1 at p.156.)

In its Opinion dated June 29, 2004, the trial court disposed of these issues as

follows:

> First of all with regard to the accomplice instruction given to the
> jury, this was done in the homicide trial at the request of defense counsel
> and was given for the benefit of the defendant not on the specific
> evidentiary finding that she was an accomplice in the homicide.  Although
> the instruction was given, this Court did not indicate that Mrs. Jones had to
> be charged in the homicide.  Further, this Court after reviewing all the
> evidence would at best, and not as a matter of law, only find that Mrs.
> Jones was an accomplice to burglary or conspiracy to commit burglary,
> which was the plan of defendant and his counter parts in that case
> surrounding the homicide trial.  Just because the Court gave an
> accomplice charge instruction in the homicide trial does not mean that the
> Court found as a matter of law that Mrs. Jones could be charged as an
> accomplice on the homicide.  The question specifically asked of Trooper
> Davis was whether or not he had evidence to charge her as an
> accomplice in a homicide and he correctly and honestly answered "No".
>
> In paragraph (ii) defendant makes a correct recitation of the pages
> of the homicide trial transcript wherein Mrs. Jones testified.  First of all,
> mere presence at the scene of a crime does not make one guilty of
> conspiracy or underlying act.  The fact that Mrs. Jones was present when
> her husband disposed of the gun does not in and of itself mean that she

could be charged with disposing of the gun. Further, the fact that she benefited from money taken during the homicide/robbery does not mean she could be charged with homicide or robbery. The sweeping up of metal shavings and moving papers and the other allegations of the defendant, all of these taken together do not provide proof that Susan Jones was an accomplice to the "homicide" or to the "disposing of a gun". Trooper Davis, after reviewing all the evidence, decided not to charge her on those counts, and as such, he did not perjure himself. The final two paragraphs raise issues that Susan Jones did indicate she accompanied her husband in disposing of the gun and that her husband later wrote two letters implicating Susan in the homicide robbery. With regard to those letters, Susan Jones' husband testified at the homicide trial that those letters were indeed lies designed to get his wife in trouble after she had found a new live-in boy friend when her husband went to prison. Further, there was absolutely no evidence whatsoever that Susan Jones was anywhere but Punxsutawney, Pennsylvania on the night of the alleged homicide, approximately thirty-five to forty miles from the scene of the homicide.

Her written statement to the police and her testimony at trial indicate that she rode along while her husband, Stanford Jones, disposed of this firearm days after the homicide. The mere riding along or presence at the crime scene does not mean she, in fact, disposed of the gun, and as such, she was not charged; and further, Trooper Davis' testimony regarding these two incidents was not perjured testimony.

With regard to the other incidents that are alleged in paragraph 2, it is believed defense counsel did not ask about these incidents because it very well may have opened the door to testimony regarding further criminal activity of the defendant, Robert Rega, and as such was a well thought out strategy consideration.

The cases cited by the defendant in support of paragraph 9-J that were reviewed by their respective appeals courts all contain instances where the prosecution knowingly presented perjured testimony which is not the case in the case *sub judice*.

(Resp't Ex. L, C.P. Jefferson Co. Op. and Order, June 29, 2004, ECF No. 31-1.)

On direct appeal, the Superior Court, relying on the trial court's analysis, agreed

that the issues were without arguable merit. (Resp't Ex. N, Br. for Appellee, Oct. 13,

2004, ECF No. 32-1); (Resp't Ex. P, Pa. Super. Ct. Op. and Order, Aug. 22, 2205, ECF

No. 32-3.)  There is little more that we can add to the trial court's opinion and therefore

we adopt their reasoning as our own.

For the aforementioned reasons, all of the subparts to claim two are denied as

procedurally defaulted; and, alternatively, they are without merit.

> (3) <u>Mr. Rega was denied due process and the right to confront his accusers as a
> result of the cumulative effect of all suppressed and false and misleading
> evidence under *Brady* and *Napue*[24].</u>

In this claim, Rega contends that the Commonwealth violated its obligation to

disclose exculpatory evidence and to refrain from presenting false and misleading

testimony and argument.  Rega alleges that this included the Commonwealth's

> (a) failure to disclose the fact that Jones had long been engaged in plea
> negotiations with the Commonwealth at the time of her testimony;
>
> (b) presentation of false testimony on the claimed non-existence of any
> pre-trial and ongoing negotiations with Jones;
>
> (c) presentation of false testimony that it had evidence to charge Jones as
> an accomplice to the Gateway Lodge homicide;
>
> (d) presentation of false testimony that it had evidence to charge Jones in
> the disposal of the Gateway Lodge murder weapon;
>
> (e) presentation of false testimony regarding Jones' expectation as to
> future prosecutions and terms of incarceration; and
>
> (f) false and misleading argument to the trial court and jury.

(Pet'r Am. Pet. for Writ of Habeas Corpus, Apr. 5, 2012, ECF No. 21 at p.84.)

Rega argues that even if any one of these violations was not material for

purposes of *Brady* and/or *Napue*, the collective impact of all these violations was to

deny him due process and his right to confront his accusers.

---

[24] *Napue v. Illinois*, 360 U.S. 264 (1959).

(a) <u>Procedural Default</u>

This claim is procedurally defaulted.  It was raised for the first time in Rega's third PCRA petition; and, as previously stated, the claim was deemed untimely by the PCRA court.  (Resp't Ex. II, Third PCRA Pet., Mar. 26, 2009, ECF No. 38-1 at pp.104-07); (Resp't Ex. NN, C.P. Jefferson Co. Op. and Order, Oct. 12, 2010, ECF No. 40-1.)  On appeal, the Superior Court agreed that the claim was untimely.  (Resp't Ex. WW, Pa. Super. Ct. Op. and Order, Nov. 18, 2011, ECF No. 46.)  Thus, this claim is procedurally defaulted and Rega's reliance on *Martinez* to excuse his default affords him no relief for the reasons outlined in Section III.D. of this Opinion, *supra*.  Accordingly, this claim is denied and not subject to habeas review.

(b) <u>Merits</u>

This claim is based on claims one and two and thus is without merit for the reasons already explained.

(4) <u>Mr. Rega was denied due process, the right against self-incrimination, counsel, and effective assistance of counsel when the Commonwealth improperly impeached the key defense witness without challenge by trial or appellate counsel.</u>

In this claim, Rega contends that the Commonwealth improperly impeached his girlfriend, defense witness Helaine Flockerzi ("Flockerzi"), through the rebuttal testimony of Jones and Trooper Davis who were permitted to testify that Flockerzi had been involved in unrelated criminal activity and that Rega was aware of that activity.  Rega avers that this testimony lacked foundation and was hearsay, improper bolstering of a witness, irrelevant, prior bad act evidence, and included an incriminating statement by Rega that was obtained in violation of his right against self-incrimination and right to

counsel.  Because trial and appellate counsel failed to challenge this improper impeachment of Flockerzi, Rega alleges that he was denied the right to effective assistance of counsel.  At trial, the Commonwealth argued that the testimony of Flockerzi's criminal involvement was introduced to expose bias on her part toward Rega, suggesting to the jury that Flockerzi was testifying favorably towards Rega because he knew that she was involved in criminal activity and could use that knowledge against her.

By way of background information, Rega's trial counsel and investigator were not able to locate Flockerzi prior to trial.  However, after trial commenced, the investigator received a phone call from Flockerzi, and arrangements were made for her to testify by telephone.  Flockerzi thereafter testified on behalf of Rega that she had never observed, nor was aware of Rega having sex with the accusers, testimony which contradicted three of the victims' accounts that Flockerzi had knowledge of their sexual encounters with Rega.  During the cross examination of Flockerzi, DA Burkett, over objection of defense counsel, received permission from the trial court to question her regarding her knowledge of stolen stereo equipment being stored in Rega's residence.  Moreover, the Commonwealth, in its case in rebuttal, recalled Trooper Davis who testified that Rega had told him that Flockerzi should go to jail.  Trooper Davis further testified that Jones had told him that Flockerzi had been involved in moving stolen broadcasting equipment. The Commonwealth then called Jones as a rebuttal witness, and elicited her testimony (1) that she reported Flockerzi's involvement in the moving of stolen broadcasting equipment, and (2) that Rega had knowledge of Flockerzi's involvement in that malfeasance.  The purpose of these offers by the Commonwealth was to establish that

Flockerzi had an improper motive to testify in favor of Rega because he could implicate

her in wrongdoing.  (Resp't Ex. CC, Pa. Super. Ct. Op. and Order, May 22, 2008, ECF

No. 35-3 at pp.15-15, n.10.)

The testimony at issue is as follows:

By Mr. Burkett: (Direct Examination of Trooper Davis on Rebuttal)

Q:      Did you in fact interview [Flockerzi] in conjunction with a number of
        investigations you were doing?

A:      Yes, I did.

Q:      Were you interviewing her as a suspect possibly?

A:      Yes.

Q:      Did Mr. Rega ever make statements to you regarding Helaine
        Flockerzi's possible culpability?

A:      Yes.

Q:      What was his statement to you?

A:      During the preliminary hearing for this case – this had been back in
        May of 2001 – Mr. Rega was sitting right beside me and I said to
        him, "Mr. Rega," -- I said, "Should Helaine be in jail?"  He said,
        "Absolutely.  Absolutely."

                                    . . . .

Q:      In your capacity as a Pennsylvania state trooper, criminal
        investigator, did you ever become aware of stolen radio tower
        equipment?

A:      Yes.

Q:      Did anybody ever give you information about Helaine Flockerzi's –

Mr. Zanic:      Objection.  Number one, it's leading.  Number two, it's
                improper impeachment.  Number three, it's irrelevant.

(Whereupon, the following discussion was held at sidebar:)

Mr. Burkett:    I'm going to call Susan Jones to prove what I just – to prove what I just asked him, if he got a report.

Mr. Zanic:      Let me ask you how it's relevant.  How is it relevant first of all?

The Court:      Because it is showing – it could tend to show that she was biased or has a motive in testifying for Rob.  It's what we discussed in chambers.

Mr. Zanic:      But where has it been established that Rob [Rega] stole that stuff?

The Court:      It's not whether he stole it.  It's the fact that he knew about it.

Mr. Zanic:      Who said that?  Where has that been established?

The Court:      If they took it out of his house we don't have to prove it beyond a reasonable doubt.  It's against motive.

Mr. Zanic:      Okay.  If that's all you are going to ask him.

Mr. Burkett:    In order to keep from implicating Rega in that, what I'm going to do is just ask her if – what I want to do is establish the connection.  Obviously Rega knew about it because Rega ripped it off, but I can't ask that.  But what I want to do is just lead her and by asking her did Mr. Rega know about, have knowledge, so that I want to lead her so I don't walk her into a complete mistrial situation.

Mr. Zanic:      I would caution on leading questions first of all.  I understand there is a –

The Court:      In that area I'm going to allow him to lead just because it's going  between two land mines that are inches apart.  I'm going to allow him to lead on that.  I'm going to allow this question.

(Whereupon, the sidebar discussion concluded.)

By Mr. Burkett:

Q:      Did you come upon information about Helaine Flockerzi knowing
        about the whereabouts of this radio transmission tower stolen
        equipment?

A:      Yes.

Q:      And did you come into information about her moving this
        equipment?

A:      Yes.

Q:      Who was the source of that information?

A:      Several people.

Q:      Any of the people here today?

A:      No.

Q:      Any of the people testify yesterday?

A:      Yes.

Q:      Susan Jones?

A:      Yes.

(Resp't Ex. E, Jury Trial Tr., May 6, 2003, ECF No. 29-1 at pp.196-99.)   Next, the

Commonwealth called Jones who testified as follows:

Q:      Do you know of [Flockerzi] being involved in the moving of stolen
        radio transmission tower equipment?

A:      Yes.

Q:      Where did she move that to?

A:      Her house.

Q:      And do you know if Mr. Rega had knowledge of her involvement?

A:      Yes.

*Id*. at p.201.

In his post-sentence motions, Rega alleged that the trial court committed reversible error regarding the impeachment of Flockerzi. (Resp't Ex. F, Post Sentence Mot., Feb. 5, 2004, ECF No. 29-2 at p.3, ¶ 6.) In this regard, the trial court held as follows:

> The District Attorney called Trooper Davis and his testimony, as well as the impeachment of Flockerzi, could be centered around three areas. First, Trooper Davis testified that Helaine Flockerzi was involved in moving radio transmission tower stolen equipment. This was another crime for which Mr. Rega was charged and [it was] alleged by the Commonwealth that Flockerzi assisted Rega. Second, Rega[,] during the preliminary hearing on this case, allegedly told Trooper Davis that Helaine Flockerzi "should be in jail". Third, Helaine Flockerzi, when she testified herself, was questioned by the District Attorney regarding the stolen radio equipment and her movement of it, as was alleged by Trooper Davis.
>
> . . . .
>
> . . . Helaine Flockerzi was a girlfriend and live-in companion of the defendant. Although the police did not have sufficient evidence to charge her with any crime, they had knowledge from their investigation that she was involved in moving certain items of stolen property. Defendant Rega, being the other resident of the house where this property was located, could possibly testify against Flockerzi and give the police enough evidence to charge Helaine Flockerzi. The importance of this factor is that Flockerzi could be influenced to testify favorable for Rega, if he knew information about her regarding other crimes, which would provide the Commonwealth with sufficient evidence on which to charge her. As such, the District Attorney was permitted to ask these questions to show a bias favorable to Rega. The focus of this questioning was not on a conviction or even being charged with a crime as that was not relevant to this case. These facts surrounded the very activity involved in this case and Flockerzi's association with the defendant.
>
> Further, with regard to Trooper Davis' testimony about Rega telling him that Helaine Flockerzi "should be in jail", this is an admission by the defendant of his own free volition. It further completes the Commonwealth's theory that Helaine Flockerzi has reason to be biased for the defendant and testify on the defendant's behalf.
>
> Flockerzi was called by the defense, with the defense knowing these statements had been made, and being aware of Flockerzi's

involvement in the investigation.  As such, the defense opened the door and the impeachment was appropriate.

(Resp't Ex. L, C.P. Jefferson Co. Op. and Order, June 29, 2004, ECF No. 31-1 at pp.9-11.)

On direct appeal, the Pennsylvania Superior Court found no error in the trial court's ruling because "[t]he Commonwealth was entitled to shed light on Ms. Flockerzi's potential bias based on [Rega]'s knowledge of her involvement in criminal conduct."  (Resp't Ex. P, Pa. Super. Ct. Op. and Order, Aug. 22, 2005, ECF No. 32-3 at pp.8-11.)  The Pennsylvania Superior Court relied on *United States v. Abel*, 469 U.S. 45 (1984), wherein the United States Supreme Court stated that "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' [sic] testimony."  *Id*. at 469.

In his first PCRA petition, Rega also made a challenge to the Commonwealth's impeachment of Flockerzi.  However, the Pennsylvania Superior Court noted that the claim had been "previously and thoroughly litigated" before it and there was "no basis upon which to disturb the ruling of the trial court that denied relief upon those claims".  (Resp't Ex. CC, Pa. Super. Ct. Op. and Order, May 22, 2008, ECF No. 35-3 at pp.14-15.)

(a) Procedural Default

This claim is procedurally defaulted because it was not raised in its current form until Rega's third PCRA petition.  (Resp't Ex. II, Third Pet. for Writ of Habeas Corpus, ECF No. 38-1.)  The PCRA court found the petition untimely and that finding was

affirmed on appeal.  (Resp't Ex. NN, C.P. Jefferson Co. Op. and Order Oct. 12, 2010, ECF No. 40-1); (Resp't Ex. WW, Pa. Super. Ct. Op. and Order, Nov. 18, 2011, ECF No. 46.)  Accordingly, the claim is procedurally defaulted for that reason, and because Rega has failed to show that he has met an exception to the procedural default rule it is denied.  *See* Section III.D., supra.  Nevertheless, as discussed *infra*, the claim is meritless.

> (b) <u>Merits</u>

Rega first asserts that Jones and Trooper Davis' testimony about Flockerzi's alleged criminal activity was inadmissible hearsay, improper bolstering, lacked foundation, irrelevant and an improper introduction of prior bad act evidence against both him and Flockerzi.  However, these issues involve matters of state evidentiary law and do not rise to constitutional magnitude.  *See Johnson v. Rosemeyer*, 117 F.3d 104, 109 (3d Cir. 1997) (federal court limited to deciding issues of constitutional dimension); *Geschwendt v. Ryan*, 967 F.2d 877, 888-89 (3d Cir. 1992); *Hawkins v. Carroll*, No. 03-1165-KAJ, 2005 WL 3336538, at *3 (D.Del. Dec. 8, 2005) (finding a violation of state evidentiary law is not cognizable in a federal habeas proceeding); *McLaughlin v. Carroll*, 270 F.Supp.2d 490, 514 (D.Del. 2003) (same).  Thus, these issues involving state evidentiary matters are not cognizable on habeas review.

Next, Rega asserts that he was denied his right against self-incrimination and right to counsel when Trooper Davis obtained what Rega considers an "incriminating statement" that Trooper Davis testified to at trial; specifically that Rega told him that Flockerzi "absolutely" should be in jail.  Rega asserts that Trooper Davis was "questioning" him during the preliminary hearing, when he was in custody and not in the

presence of his attorney; and, according to Rega, this amounted to a "custodial

interrogation" and a violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), because

Trooper Davis intended the questioning to elicit an "incriminating response".[25]  He

contends that his response to Trooper Davis was tantamount to a confession, "since if

Ms. Flockerzi should be in jail for the conduct alleged by the complaining witnesses, so

too should [he]."  (Pet'r Am. Pet. for Writ of Habeas Corpus, Apr. 5, 2012, ECF No. 21 at

pp.94-96.)

     In support of this claim, Rega relies on *Rhode Island v. Innis*, 446 U.S. 291, 301

(1980), where the Supreme Court explained:

> By "incriminating response" we refer to any response – whether
> inculpatory or exculpatory – that the prosecution may seek to introduce at
> trial.  As the Court observed in *Miranda*:
>
> > No distinction can be drawn between statements which are
> > direct confessions and statements which amount to
> > 'admissions' of part or all of an offense.  The privilege
> > against self-incrimination protects the individual from being
> > compelled to incriminate himself in any manner; it does not
> > distinguish degrees of incrimination.  Similarly, for precisely
> > the same reason, no distinction may be drawn between
> > inculpatory statements and statements alleged to be merely
> > 'exculpatory'.  If a statement made were in fact truly
> > exculpatory it would, of course, never be used by the
> > prosecution.  In fact, statements merely intended to be

---

[25]    *Miranda* prohibits the government from using "statements, whether exculpatory
or inculpatory, stemming from custodial interrogation of the defendant unless it
demonstrates the use of procedural safeguards effective to secure the privilege against
self-incrimination." *Id*. at 444.  *Miranda* requires that, prior to a custodial interrogation,
police must warn a person that he has a right to remain silent, that anything he says can
be used against him in a court of law, that he has the right to the presence of an
attorney, and that if he cannot afford an attorney, one will be provided to him.  *Id*. at
479.  If, after receiving these warnings, the person knowingly and intelligently waives
these rights and provides a statement, that statement can be used against the person in
a criminal proceeding.  *Id*.

> exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statements.

*Id*. at 301 n.5 (citing *Miranda*, 384 U.S. at 476-77).

When raised in state court in Rega's post-sentence motion, the state court found that Rega's statement to Trooper Davis was "an admission by the defendant of his own free volition" and that it "complete[d] the Commonwealth's theory that Helaine Flockerzi ha[d] reason to be biased for the defendant and testify on the defendant's behalf." (Resp't Ex. L, C.P. Jefferson Co. Op. and Order, June 29, 2004, ECF No. 31-1 at p.11.) The court further stated that it was "clear from the sum total of the testimony that Mr. Rega engaged Trooper Davis in conversation who at some point asked, 'Should Helaine be in jail?' to which Rega answered, 'Absolutely, absolutely.'" *Id*. at p.13. The court determined that there was no *Miranda* violation because "[t]his evidence itself is not incriminating and the interrogation was not custodial. It was garnered voluntarily from Rega and only became relevant when Rega himself called Helaine Flockerzi to the witness stand." *Id*.

It is clear that Rega was not "interrogated" within the meaning of *Miranda*, nor was his right against self-incrimination violated when Trooper Davis testified at trial to Rega's response to the question of whether he thought Flockerzi "should be in jail". According to Attorney English, who represented Rega at the preliminary hearing, he recalled the conversations between Trooper Davis and Rega as "pretty innocuous" and characterized it as "more like little jabs" and not "extended talks". (Resp't Ex. L, C.P.

67

Jefferson Co. Op. and Order, June 29, 2004, ECF No. 31-1 at p.13) (citing to Tr. of Hr'g., April 28, 2004, pp.62-63). He was asked whether he recalled Trooper Davis ever trying to get incriminating statements out of Rega, and he said that he "never observed that" and if he had he "would have tried to put a stop to it". *Id*.

It is also clear that Rega's response to Trooper Davis' question was not incriminating. It was neither inculpatory nor exculpatory as to Rega, it was not a confession by Rega, and it did not amount to guilt by association. Furthermore, it was not a statement that confirmed or denied Rega's involvement in the crimes of which he was charged and for which he was on trial. *See Innis*, *supra*. We agree with the state court's finding that it was simply an admission made of Rega's own free volition that was ultimately used to show that Flockerzi had a reason to be biased.

Viewing the circumstances surrounding Rega's statement, it is our opinion that the record does not support Rega's contention that Trooper Davis deliberately elicited incriminating words that were used against Rega at his trial.[26] Therefore, there was no violation under the Pennsylvania rules of Evidence or Federal Constitution.

---

[26] It is unclear whether Rega also raises a due process claim related to Trooper Davis' questioning him at the preliminary hearing, but to the extent that he does, he is also not entitled to habeas relief. In this regard, the United States Supreme Court has "long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). However, these elements of a police coercion are not present here. In this case, there is nothing in the record to suggest that Trooper Davis was "interrogating" Rega, much less used coercive tactics in doing so. Nothing suggests that Rega's answer to Trooper Davis regarding Flockerzi was anything but voluntary. According the state court's factual findings the proper amount of deference, we cannot conclude that the trial court's decision admitting Rega's statement amounted to a due process violation.

Finally, Rega argues that he was (1) "denied due process and a fair trial when the trial court allowed the Commonwealth to introduce evidence through Trooper Davis and Susan Jones that was inadmissible", and (2) a derivative ineffective assistance of counsel claim for failing to challenge the "improper impeachment" of Flockerzi. In this regard, Rega is not entitled to habeas relief if it was harmless error for the court to allow the Commonwealth to improperly impeach Flockerzi. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (announcing the standard used in habeas cases when determining whether constitutional trial error warrants a habeas petitioner relief). An error is harmless unless it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. In determining whether there is harmless error, we examine the impact of the error on the trial as a whole. *Yohn v. Love*, 76 F.3d 508, 523 (3d Cir. 1996). Thus, we ask whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error. *Id*.

In addition to the due process claim, Rega argues that he was deprived of the right to effective assistance of trial and appellate counsel for failing to raise any issues related to the "improper impeachment" of Flockerzi. To prove this, he must show that (1) his counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To show prejudice, Rega must demonstrate that the ineffective assistance of counsel actually had an adverse effect on the defense such that the result of the proceeding would have been different but for counsel's errors. *Id*. at 693-94.

Rather than applying *Brecht* and *Strickland* tests separately, the Third Circuit Court of Appeals has held that an error that is harmless under *Brecht* is also considered non-prejudicial under *Strickland*. *See Whitney v. Horn*, 280 F.3d 240, 258 (3d Cir. 2002) (explaining that the purpose of both tests is to determine whether the error affected the jury's verdict).

Rega argues that trial counsel performed deficiently when the prosecution improperly impeached Flockerzi by: (1) attempting to prove Flockerzi's alleged involvement in criminal activity using testimony that was hearsay, bolstering, lacking foundation, irrelevant, and prior bad act evidence; and (2) offering an incriminating statement by Rega that was obtained in violation of his right against self-incrimination and right to counsel. According to Rega, trial counsel did not adequately object to this improper impeachment, request a mistrial, request a limiting instruction with regard to Trooper Davis' hearsay testimony, or move to suppress the statement obtained in violation of Rega's right to counsel. Rega asserts that had Flockerzi not been improperly impeached, there is a reasonable likelihood that the result of his trial would have been different because she was the key defense witness who refuted much of the victims' testimony.

The trial court, in its Opinion denying post-sentence motions, addressed Rega's contention that it had committed several errors dealing with the impeachment of Flockerzi. It stated:

> . . . . Helaine Flockerzi was a girlfriend and live-in companion of the defendant. Although the police did not have sufficient evidence to charge her with any crime, they had knowledge from their investigation that she was involved in moving certain items of stolen property. Defendant Rega, being the other resident of the house where this property was located,

could possibly testify against Flockerzi and give the police enough evidence to charge Helaine Flockerzi. The importance of this factor is that Flockerzi could be influenced to testify favorably for Rega, if he knew information about her regarding other crimes, which would provide the Commonwealth sufficient evidence on which to charge her. As such, the District Attorney was permitted to ask these questions to show a bias favorable to Rega. The focus of this questioning was not on a conviction or even being charged with a crime as that was not relevant to this case. These facts surrounded the very activity involved in this case and Flockerzi's association with the defendant.

(Resp't Ex. L, C.P. Jefferson Co. Op. and Order, June 29, 2004, ECF No. 31-1 at pp.10-11.) The trial court concluded that "the impeachment was appropriate" because the defense opened the door by calling Flockerzi as a witness "knowing these statements had been made, and being aware of Flockerzi's involvement in the investigation." *Id*. at p.11.

On direct appeal the Pennsylvania Superior Court found no error in the trial court's ruling because the Commonwealth "was entitled to shed light on Ms. Flockerzi's potential bias based on [Rega]'s knowledge of her involvement in criminal conduct." (Resp't Ex. P, Pa. Super. Ct. Op. and Order, Aug. 22, 2005, ECF No. 32-3 at p.11.) When the claim was raised again in Rega's first PCRA petition, the Pennsylvania Superior Court, on appeal, once again rejected it stating that each of Rega's claims regarding the improper impeachment of Flockerzi "were previously and thoroughly litigated before this Court, [and] we detect no basis upon which to disturb the ruling of the trial court that denied relief upon those claims." (Resp't Ex. CC, Pa. Super. Ct. Op. and Order, May 22, 2008, ECF No. 35-3 at p.15.)

Not only do we agree with the state courts' finding that the impeachment of Flockerzi was proper, but we also find that any error in allowing it in was harmless. We

note that this case, like many sex crime cases, was essentially a "he said, she said" scenario, with no physical evidence linking Rega to the crimes. The victims' credibility was *essential* to both the prosecution *and* to the defense, and while Flockerzi's testimony suggested that the victims were lying, it is too large an inferential leap for us to conclude that Flockerzi's impeachment had a "substantial" or "injurious" effect on the jury's verdict. Furthermore, one of the most significant and influential aspects of determining witness credibility is watching their behavior and demeanor in the courtroom, something a reviewing court is not able to observe. *See Nara v. Frank*, 488 F.3d 187, 201 (3d Cir. 2007) (quoting *United States v. Oregon Medical Society*, 343 U.S. 326, 339 (1952), which was quoting *Boyd v. Boyd*, 169 N.E. 632 (N.Y. 1930)). Therefore, we cannot go so far as to say that had Flockerzi not been impeached in the manner in which Rega complains was improper, the outcome of the trial would have been different.

Accordingly, we find no error; and, even so, Rega has not shown that the error he alleges was not harmless under *Brecht*. Therefore, counsel's conduct was not prejudicial under *Strickland. See Whitney*, 280 F.3d at 258. Accordingly, Rega is not entitled to relief on either his due process or ineffective assistance of counsel claims.

Additionally, since Rega has not shown prejudice, we find that appellate counsel was not ineffective for failing to raise any of the alleged claims related to the impeachment of Flockerzi on appeal. *See United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective assistance of counsel based on an attorney's failure to raise a meritless argument.").

(5) <u>Mr. Rega was denied effective assistance of counsel when trial counsel failed to timely locate and adequately interview, prepare and present a key defense witness.</u>

In this claim, Rega argues that trial counsel failed to timely locate and prepare defense witness Flockerzi, and, because of this, Flockerzi's testimony was incomplete and had to be presented by telephone, which, according to Rega, made it more likely that the jury would give less weight to her testimony.

Rega states that this claim was raised in his first PCRA petition, but he is incorrect. The only mention of Flockerzi's testimony by phone in Rega's first PCRA petition was on appeal when he claimed that prior counsel were ineffective for failing to object to improper remarks made by the Commonwealth during closing arguments. Specifically, Rega claimed that the prosecutor's arguments directed toward the credibility of Flockerzi were improper. However, the Pennsylvania Superior Court found no merit in the claim, stating that it "had previously held that the Commonwealth properly introduced impeachment evidence suggesting that [Flockerzi] was biased in favor of [Rega]" and "because [Rega] could implicate her in wrongdoing," the "argument of the prosecutor that Flockerzi was less credible because she testified by telephone was based upon reasonable inferences drawn from the evidence presented." (Resp't Ex. CC, Pa. Super. Ct. Op. and Order, May 22, 2008, ECF No. 35-3 at p.25.)

(a) <u>Procedural Default</u>

This claim is procedurally defaulted because it was not raised in its current form until Rega's third PCRA petition, which was dismissed as untimely and affirmed on appeal. (Resp't Ex. II, Third PCRA Pet., Mar. 26, 2009, ECF No. 38-1 at pp.7, 128-

136); (Resp't Ex. NN, C.P. Jefferson Co. Op. and Order, Oct. 12, 2010, ECF No. 40-1); (Resp't Ex. WW, Super. Ct. Op. and Order, Nov. 18, 2011, ECF No. 46.)

Rega seemingly agrees that this claim is procedurally defaulted but again relies on *Martinez* to demonstrate "cause" for the default. For the reasons discussed in Section III.D. of this Opinion regarding *Martinez*, we find that *Martinez* is inapplicable to Rega's situation for purposes of this claim because the only person who can be charged with "cause" for any default is Rega himself. In this regard, *Martinez* does not apply to him and the claim is denied as procedurally defaulted.

(b) Merits

Even if this Court could reach the merits of this claim, it would not entitle Rega to habeas relief despite his belief that there is a reasonable likelihood that the verdict would have been different had Flockerzi given in-person testimony.

During the lunch break on the second day of Rega's trial, trial counsel's investigator, Mr. Ellis, announced that he received a voice message on his cell phone from Flockerzi, who, up until that point could not be located. Because she was in New Jersey, and unable to travel to Huntington, Pennsylvania in time to testify in person, the trial court permitted Flockerzi to testify via telephone. Prior to her testimony, the court asked Mr. Ellis to detail his search for Flockerzi. Mr. Ellis advised the court that he and his partner had gone to some of Flockerzi's previous addresses looking for her, one of which was in Venus, Pennsylvania. They were informed by the resident of that house that Flockerzi had left in May of 2002 and that she had possibly moved to New Jersey. The resident knew no further information. Mr. Ellis and his partner then conducted phone record searches and came up with an address close to Oil City, Pennsylvania.

The resident of that address turned out to be Flockerzi's brother.  When they asked him if he could put them in contact with Flockerzi, he said that he would not.  Mr. Ellis left a business card and asked that he have Flockerzi call him if she would be willing to do so, and he agreed.  After hearing from Mr. Ellis, the court stated on the record that the defense conducted a "diligent search" for Flockerzi.  (Resp't Ex. E, Jury Trial Tr., May 6, 2003, ECF No. 29-1 at pp.103-06.)

First, we do not disagree with the trial court's "diligent search" determination; and, therefore, we find that trial counsel's performance was not deficient in failing to locate Flockerzi prior to trial in time for her to testify in person.  Rega claims that he was prejudiced because had she been located earlier, she would have been adequately interviewed, prepped for trial and testified that (1) she saw Jones give the complaining witnesses alcohol and marijuana, (2) she told police that she never saw Rega have sex with the complaining witnesses or serve them alcohol, (3) she never saw any Peach Schnapps or Golden Schlager in Rega's house, and (4) E.H. was present during the summer of 2000 when Rega told Flockerzi he was going to stay overnight at the Clarion Comfort Inn.

As Rega's current counsel repeatedly emphasizes throughout the amended habeas petition, Flockerzi refuted much of the victims' testimony at trial, including the fact that she denied ever seeing them have sex with Rega or Rega provide them with alcohol.[27]  She even testified that Rega's testicles were abnormally large; a fact that the

---

[27]     While Flockerzi was not specifically asked whether she saw Peach Schnapps or Golden Schlager in Rega's house, she did testify that she never saw Rega provide the victims with alcohol and she did not provide them with it either.  (Resp't Ex. C, Tr. of Pre-Trial Mot. Hr'g, May 5, 2003, ECF No. 29-1 at p.170.)

victims had failed to identify when asked whether they noticed anything abnormal about Rega's anatomy. Thus, Rega could not have been prejudiced in the manner in which he complains because the testimony he claims Flockerzi would have given had she been located earlier was the exact same testimony she actually gave at trial.

Furthermore, the record indicates that it is unlikely Flockerzi would have cooperated had she been located any earlier. She made it clear at trial that she did not want to testify or have anything to do with the case. On redirect examination by Rega's trial counsel, Flockerzi testified as follows:

By Mr. Zanic:

Q:     Ma'am, am I correct that I spoke with you in judge's
       chambers and I interviewed you, is that right?

A:     Yes. Because when I called – when my sister-in-law called
       me and told me that they were looking for me, I called
       Trooper Lee to find out if I had to talk to them.

Q:     So you called the state police barracks, right, first?

A:     Yes. Before I called you guys. And he told me that I did not
       have to talk to you unless I was subpoenaed. When you
       called me this morning and you said that I was subpoenaed,
       I told you I did not believe you; that I wanted the formation
       [sic] from the judge. So I got on the phone and you told me
       that I was subpoenaed.

Q:     And then the judge allowed you to talk to me to talk about
       your testimony, is that right?

A:     Yes.

Q:     Did I ever suggest any answer to you?

A:     No, sir.

Q:     Did I ask you the questions in exactly the same manner that
       I asked them to you today?

| A: | Yes. |
|---|---|
| Q: | And did you want to testify today? |
| A: | No, I did not.  I did not want nothing to do with this. |
| Q: | In fact, you were pretty mad at me? |
| A: | Yes, I was.  And I did the same with the judge. |
| Q: | And you were mad at the judge too? |
| A: | Yes, I was. |

(Resp't Ex. E, Tr. of Jury Trial, May 6, 2003, ECF No. 29-1 at pp.182-84.)  Also, earlier in her testimony Flockerzi indicated that she refused to talk to Trooper Davis because she felt that he was rude and arrogant.  *Id.* at pp.173-74.

To the extent Rega contends that he was prejudiced because counsel was not able to prepare Flockerzi, or have her testify that she saw Jones give the victims alcohol and marijuana, or that E.H. was present during the summer of 2000 when Rega told Flockerzi that he was going to stay overnight at the Clarion Comfort Inn, we find that this testimony, assuming its admissibility, would not have established by a reasonable probability that the result of the trial would have been different because most of it is irrelevant.

Finally, Rega's contention that he was prejudiced because the jury was not able to see Flockerzi testify in person and visually assess her credibility is also not enough to establish a reasonable probability that the result of the trial would have been different because Rega has not proffered any reason why the jury would have been likely to

credit her testimony over the victims' had she testified in person other than his conclusive speculation.

Accordingly, for the aforementioned reasons, this claim is denied as procedurally defaulted; and in the alternative, it is denied on the merits.

   (6) <u>Mr. Rega was denied due process, proof of guilt beyond a reasonable doubt, a unanimous jury verdict on all counts and effective assistance of counsel when he was convicted of multiple sex offenses based on generic and nonspecific testimony. All prior counsel failed to litigate this issue.</u>

In this claim, Rega claims that the jury could not have understood that it had to reach agreement on the specific act Rega purportedly committed for each and every count because the trial court failed to give an adequate unanimity instruction. Rega claims that the evidence to support most of the counts against him was generic and non-specific and that the testimony on these counts lacked any detail about when, where or how the offenses purportedly took place or what specifically occurred.

   (a) <u>Procedural Default</u>

This claim is procedurally defaulted. It was first raised in Rega's brief on direct appeal, and the Pennsylvania Superior Court deemed the issue waived because Rega did not raise a specific and timely objection to the jury charge. (Resp't Ex. P, C.P. Jefferson Co. Op. and Order, Aug. 22, 2005, ECF No. 32-3 at p.19) (citing *Commonwealth v. Forbes*, 867 A.2d 1268, 1274 (Pa. Super. 2005)). Rega raised the claim again in his first PCRA petition, but he raised it as one of ineffective assistance of trial and appellate counsel for failing to challenge the sufficiency of the evidence; specifically, "(1) that the Commonwealth failed to prove that he and the complainants, S.S. and R.H., were not married, and (2) that the evidence was insufficient to sustain

the multiple counts of sexual assault due to the complainants E.H. and D.W.'s inability to recall the exact number of sexual encounters that they had had with [him], their inability to identify the specific dates of their encounters, and their use of terms such as 'maybe,' 'I don't know,' and 'a lot.'"  (Resp't Ex. CC, Pa. Super. Ct. Op. and Order, May 22, 2008, ECF No. 35-3 at p.11.)  The Pennsylvania Superior Court found the claim patently meritless, however, and Rega did not make the specific challenge he now makes.

Because this claim was not raised in its current form until Rega's third PCRA petition, which was untimely and affirmed on appeal, the claim is procedurally defaulted. (Resp't Ex. II, Third PCRA Pet., Mar. 26, 2009, ECF No. 38-1 at pp.8, 145-153); (Resp't Ex. WW, Pa. Super. Ct. Op. and Order, Nov. 18, 2011, ECF No. 46-1.)

To the extent Rega relies on *Martinez* to demonstrate "cause" for the procedural default of this claim, his argument fails for the reasons outlined in Section III.D. of this Opinion and the claim is therefore denied as procedurally barred.  Nevertheless, the claim is without merit.

(b) Merits/Procedural Default

The irony in this claim is that prior to trial the Commonwealth moved to amend the Information to consolidate counts so that convictions for each count would be based on multiple incidents happening on various dates throughout the time period alleged in the Information.  In sum, this would have addressed the very thing of which Rega now complains.  However, Rega's trial counsel objected to the amendment based on an "all or nothing" trial strategy.  Trial counsel explained this strategy as follows:

Mr. Zanic:      Judge, we would object to the amendment of the information at this late date.  We think that each individual count should be addressed on the information.

Mr. Burkett:  Your Honor, I believe that would simply be an attempt to confuse the jury, give them too many charges to deliberate over.  We are not changing the conduct that is charged.  We are not changing the timeframe over when it was committed.  There is no new crime being added.  I believe we would be perfectly within our [ ] to amend.  I think it would make the court's job easier and the jury's easier.

The Court:     You still wish to pursue the amendment then?

Mr. Burkett:  Yes.

Mr. Zanic:      If I may be heard on the confusing the jury part of it, each count was pursued at the preliminary hearing, and the district magistrate wasn't confused; although some of the witnesses were.  The information was filed just like it was charged on the complaint.

We had the preliminary hearing, had the information.  We had pre-trial hearings.  We went forward on this.  I prepared for trial.  I prepared based on – my questioning has a lot to do with the number of times that it's happened, and my whole defense is designed around the number of counts, which you will see.  And I just think it's kind of a trial by surprise and cutting into my defense at this late date.

The Court:     Well I was more concerned that you wouldn't want all those counts.

Mr. Zanic:      I do.

The Court:     If you want them all, I will leave them there.  I will deny the motion to amend, and we will get the jury slip ready on the basis of each count.

Mr. Zanic:      Let me say this.  In my discussions with my client, our defense and he understands this sort of a – it's an all or nothing defense.  That's the reason for doing this.  I

> understand that it seems kind of bizarre, but if you think about it, what's the difference between a 10 to 20 or a 300 to 800. That's where we are going with this thing. It is an all or nothing for us.

> The Court: I am aware that Mr. Rega is very astute at the system. So he knows if he is convicted of each of those 57 counts, they each get treated separately or can be treated separately. We will let it be his choice. So I will deny the motion to amend.

(Resp't Ex. C, Tr. of Pre-trial Mot. Hr'g., May 5, 2003, ECF No. 28-1 at pp.16-18.)

Rega argues that trial counsel's advice regarding pursuing an "all or nothing" strategy was ineffective. However, this particular claim of ineffective assistance of trial counsel was never raised in the state courts in a procedurally correct manner and is now procedurally defaulted. Moreover, *Martinez* is inapplicable because the failure to raise this ineffectiveness claim in the state courts was attributed to Rega. *See* Section III.D., *supra*. Rega has not met his burden to excuse the default of the instant claim. Therefore, he is not entitled to habeas review.[28]

> (7) <u>Mr. Rega was denied due process, protection against double jeopardy and the effective assistance of counsel because he was deprived of notice of the specific charges against him and his right to present a defense. All prior counsel failed to litigate this issue.</u>

In this claim, Rega also argues that he could not adequately prepare all of his defenses for trial because the Information charged him with conduct that spanned a period of many months without identifying the dates on which that conduct occurred.

---

[28] We note, however, that on direct appeal from Rega's judgment of sentence, the Superior Court concluded that the jury's verdict of acquittal on one count indicated that "the jury was able to separate the offenses, as instructed, and consider the proof of each offense independently of the others." (Resp't Ex. P, Pa. Super. Ct. Op. and Order, Aug. 22, 2005, ECF No. 32-3 at p.19.) Rega has not presented any direct evidence, much less clear and convincing evidence that contradicts this finding.

He contends that without details of the alleged offenses he could not cross-examine the witnesses on contradictory aspects of their stories or the physical impossibility of their claims. He also contends that he could not present any alibi defenses without evidence of when the sex offenses occurred because no time frame was established beyond the Information's allegation that the offenses took place between May 1, 2000 and January 3, 2001. Finally, he contends that trial counsel was ineffective for failing to take steps to remedy this violation and that appellate counsel was ineffective for failing to raise this claim on direct appeal.

(a) Procedural Default/Merits

This claim is essentially the same as claim six apart from new factual allegations pertaining to the lack of specificity as to the sexual encounters with the victims. Like claim six, it too is procedurally defaulted.

The underlying substantive claim at issue, which is in effect a challenge to the sufficiency of the evidence, was raised in Rega's first PCRA petition in terms of ineffective assistance of trial and appellate counsel and it was rejected for the reasons stated in the discussion on the previous claim. Once again, he did not make the challenge he now makes until he raised it in its current form in his third PCRA petition. (Resp't Ex. II, Third PCRA Pet., Mar. 26, 2009, ECF No. 38-1 at pp.8, 153-57); (Resp't Ex. WW, Pa. Super. Ct. Op. and Order, Nov. 18, 2011, ECF No. 46-1.) Because that petition was untimely, the claim is defaulted, and to the extent Rega relies on *Martinez* to demonstrate "cause" to excuse the procedural default, his argument fails for the reasons explained in Section III.D. of this Opinion.

Additionally, this claim is without merit because of trial counsel's "all or nothing" strategy that was discussed in claim six. Rega argues that his trial counsel was ineffective for employing this approach, but this ineffectiveness claim is defaulted because Rega did not make such challenge in the state courts. Once again, Rega cannot rely on *Martinez* to excuse the default of this ineffectiveness claim because any ineffectiveness in failing to raise it is attributed to him.

Because Rega has not met his burden to excuse the default of the instant claim the claim is denied and he is not entitled to habeas review.

(8) <u>Mr. Rega was denied effective assistance of counsel when trial counsel unsuccessfully attempted to prove Mr. Rega's exculpatory genital abnormality through the testimony of a witness who did not have knowledge of the relevant issue.</u>

In support of this claim, Rega states that he told trial counsel that the credibility of the victims could be impeached by asking them to describe Rega's genital abnormality and by then independently establishing the existence of that abnormality as a long term medical condition. According to Rega, even though trial counsel had medical records in his possession that supported this defense, and also obtained the trial court's permission for Rega to be examined by an independent medical doctor, counsel for Rega elicited evidence of Rega's genital abnormality at trial through the testimony of Deputy Sheriff Kurt Brudknock, who testified that he had knowledge of Rega's condition from having conducted strip searches on Rega.[29]

---

[29] He testified that Rega's "scrotum is enlarged. I would estimate it the size of a large orange or possibly small grapefruit." (Resp't Ex. E, Jury Trial Tr., May 6, 2003, ECF No. 29-1 at p.164.) On cross-examination, he admitted that he could not testify as to Rega's condition before June of 2002. *Id.* at p.165.

Rega argues that trial counsel's decision to call a deputy sheriff to testify to the genital defect, rather than an independent medical expert, was deficient performance that stripped him of the presumption of innocence by revealing to the jury that he was in custody and subject to strip searches. Additionally, Rega argues that Deputy Brudknock did not have personal knowledge of the genital abnormality at the time of the charged sexual offenses, and, therefore, did not impeach the witnesses' credibility.

In his post-sentence motions, Rega argued that his trial counsel was ineffective by calling Deputy Brudknock to testify that he had unusually large testicles instead of calling Renee Rega/Edwards/Polippo, Rega's wife, and was further ineffective by failing to call one of his medical doctors. In ruling on this claim, the trial court explained trial counsel's strategy.

> . . . . The Court recalls defense counsel in asking Mr. Brud[k]nock to testify, indicated that because of the seriousness of the charges, the jury should very well believe that at some point the defendant may have been arrested or in custody. Further, on page 32 and 33 of the Transcript of Testimony of April 28, 2004, Mr. Zanic testified that even though the defendant's wife wanted to testify regarding this condition, he did not believe she was a credible witness. He further buttressed this by indicating he had reviewed the homicide trial transcript and found that not only was she not credible, he felt she may have perjured herself in her testimony at that time. The strategy went even further where on page 43 Mr. Zanic indicated he thought the deputy sheriff was the best witness that they had because he was very credible. A review of the trial transcript will indicate that Deputy Brud[k]nock did in fact testify Mr. Rega had unusually large testicles, and as such it is believed this testimony was considered credible by the jury, even though insufficient to secure an acquittal.

> Because defense counsel discussed the problems with the defendant's wife's credibility and further because he had a reasonable strategy; it was not ineffective for defense counsel to call Deputy Brud[k]nock, and as such, this motion should be denied. It should further be noted that the cases cited by the defendant discussing brief glimpses by the jury of the defendant in restraints would not be appropriate in this case. Deputy Brud[k]nock was in plain clothes, was not in any way

restraining or holding the defendant and was simply called from the gallery of people in the courtroom to testify on behalf of the defendant. It could be viewed that Mr. Brud[k]nock was in the courtroom voluntarily to assist the defendant in his testimony which would further bolster Rega's case and defense.

Defendant further argues in a supplemental post sentence motion, which was untimely filed, that defense counsel was ineffective for failing to call one of the defendant's medical doctors. The Court is aware of the medical records which the defendant possessed and these were shown to the Court regarding this condition. Any doctor or all doctors who observed the condition were employed by the State Department of Corrections who made findings regarding Mr. Rega's testicles. Certainly, a doctor employed by the State Department of Corrections being called to the stand would be more prejudicial than the deputy sheriff who was credible. Further, this additional motion being filed after the date of hearing, the District Attorney and defense counsel have had no opportunity to present evidence regarding it. However, Mr. Zanic, having discussed those records with the Court, it is believed from circumstantial evidence, that a strategy discussion was held whereby it was decided the doctor would not be called. In any event, it was a reasonable strategy, and as such, request of the defendant should be denied.

(Resp't Ex. L, C.P. Jefferson Co. Op. and Order, June 29, 2004, ECF No. 31-1 at pp.20-22.) On direct appeal, Rega did not raise any issue related to his genital abnormality.

In his first PCRA petition, Rega argued that appellate counsel was ineffective for failing to argue that trial counsel's decision to call Deputy Brudknock as a witness for the defense violated his rights to a presumption of innocence and a fair trial. On appeal of the denial of that petition, the Pennsylvania Superior Court observed that

. . . in this instance, appellant's defense set forth the case that he had been unjustly imprisoned based upon false allegations of sexual assault. In support of this theory of the case, trial counsel, during his opening statement, argued that Susan Jones was "the person *behind putting [appellant] away*." N.T., May 5, 2003, p. 23 (emphasis supplied). Moreover, Thomas Fenstermaker testified on behalf of the defense that "[complainant D.W.] mentioned [to him] that *they [the complainants] don't know why they put [appellant] in jail* because he didn't do nothing." N.T., May 6, 2003, p. 186 (emphasis supplied). Consequently, since appellant made known the fact of his imprisonment to the jury, we

discern no basis upon which to conclude that the calling of the deputy
sheriff caused any impairment upon the presumption of innocence as to
warrant relief.  ***Cf.: Commonwealth v. Dooley***, 481 A.2d 336, 341
(Pa.Super. 1984) (trial court did not err in denying a motion for mistrial
based upon defendant's claim that jurors saw him in handcuffs,
particularly since he previously told the jury that he was in custody).  Thus,
the contention that appellate counsel was ineffective for failing to preserve
a challenge on that basis was patently meritless, and the trial court
properly denied PCRA relief.

(Resp't Ex. CC, Pa. Super. Ct. Op. and Order, May 22, 2008, ECF No. 35-3 at pp.18-

19.)

(a) Procedural Default

A portion of this claim is procedurally defaulted; specifically, the issue of it being

ineffective to call a witness who could not establish the size of Rega's testicles at the

time of the offenses.  This specific claim was not raised until Rega's third PCRA petition,

which was untimely.  Therefore, that aspect of this claim is procedurally defaulted, and

Rega has not met his burden of excusing the default.

The two aspects of this claim that are not defaulted are Rega's contention that

trial counsel was ineffective for calling Deputy Brudknock to testify as to his condition,

and thus alerting the jury of his incarceration, and appellate counsel's ineffectiveness for

failing to allege the same on appeal.  These issues were raised for review and denied in

Rega's first PCRA petition.  They were appealed and also denied on the merits by the

Pennsylvania Superior Court.  Thus, these issues will be reviewed under the § 2254(d)

standard.

(b) Habeas Review

Rega first argues that the state court's finding that trial counsel was not

ineffective for having Deputy Brudknock testify as to the condition of Rega's genitals

86

was "contrary to, or involved an unreasonable application of, clearly established Federal law". We disagree.

The "clearly established Federal law" in which to analyze Rega's ineffective assistance of counsel claim is governed by *Strickland*. Since the state court applied the *Strickland* analysis when it evaluated Rega's claim, there can be no question that its adjudication withstands review under the "contrary to" clause of § 2254(d)(1). *See Williams*, 529 U.S. 406 ("a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.")

In analyzing Rega's claim under the two-part test announced in *Strickland*, this Court must apply the standards set forth in section 2254(e) concerning the presumption of correctness applicable to state court factual findings. The question of effectiveness of counsel under *Strickland* is a mixed question of law and fact; it requires the application of a legal standard to the historical, fact determinations. *Berryman v. Morton*, 100 F.3d 1089, 1095 (3d Cir. 1996). In this regard, a state court's finding that counsel had a strategy is a finding of fact to which the presumption applies. *Id*. Likewise, a state court's determination that a decision was a tactical one is a question of fact. *Id*. A state court's determination of whether such a strategy or decision was reasonable, however, is a question of law. *Id*. *See also McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir.) ("[A] state court's conclusion that counsel rendered effective assistance is not a finding of fact subject to deference by a federal court."), *cert. denied*, 510 U.S. 1028, 114 S. Ct. 645 (1993).

Here, the state courts identified the correct governing legal rule for ineffective assistance of counsel claims, *Strickland*, and reasonably applied it to the facts of Rega's case. The state courts found that trial counsel made a strategic decision to have Deputy Brudknock testify as to Rega's genital condition, as opposed to Rega's wife or through medical records belonging to the Department of Corrections. Rega has not shown that this strategy was unreasonable or prejudicial.

While Rega's current counsel references the fact that Rega's trial counsel was in possession of medical records that supported his defense, the record transcripts reveal that these medical records were property of the State Department of Corrections that did not exist until after Rega was incarcerated. This fact, which is conveniently appears to have been overlooked by Rega's current counsel, rebuts Rega's entire claim that Deputy Brudknock's testimony stripped away his presumption of innocence by revealing to the jury that Rega was in custody and subject to strip searches. If it is Rega's position that he was prejudiced by the Deputy's testimony because it implied that he was in custody then we fail to see how he would have been less prejudiced by trial counsel using Rega's medical records belonging to the Department of Corrections, which would have informed the jury that Rega was not just in custody but imprisoned. Taken as a whole and granting deference to the findings of the state courts, Rega has not met his burden of showing that trial counsel's performance was unreasonable. Because Rega fails to satisfy the first prong of *Strickland*, and *Strickland* requires that

both prongs be met, there is no need to conduct a prejudice analysis under *Strickland*'s second prong.[30]

Therefore, Rega does not overcome the burden imposed by § 2254(d). Additionally, we find that appellate counsel was not ineffective for failing to raise this claim on appeal. *See United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective assistance of counsel based on an attorney's failure to raise a meritless argument.").

Finally, even though Rega's claim that trial counsel's performance was deficient for failing to call a witness who could not establish the size of his testicles at the time of the offenses is procedurally defaulted and barred from habeas review, we also find that counsel was not ineffective in this regard. There is no evidence in the record to suggest that a medical doctor could have established the essential point that Rega complains, that he was suffering from the genital abnormality at the time he was having sex with the victims. Therefore, even testimony from an independent medical examiner not affiliated with the Department of Corrections could not have impeached the victims' credibility as to this fact.

In sum, we do not see the prejudicial effect in trial counsel having Deputy Brudknock testify as opposed to an independent medical examiner or establishing the existence of such medical issue through Department of Corrections' medical records. Even though the Deputy was not capable of establishing that Rega was suffering from this genital abnormality during the time he was having sex with the victims, we find that

_____

[30]    Nonetheless, we glean no prejudice given that Flockerzi, Rega's girlfriend, testified that Rega's genital condition existed back at the time of the offenses.

trial counsel was not ineffective for calling him to testify.  Thus, Rega would not be entitled to habeas relief on this claim even if it were not procedurally defaulted.

> (9) <u>Mr. Rega was denied his right against cruel and unusual punishment when he was sentenced to a maximum of 354 years imprisonment, a penalty that is grossly disproportionate to the offenses for which he was convicted.</u>

Rega argues that he was sentenced to a term of imprisonment that is grossly disproportionate to the offenses for which he was convicted – a minimum of 147 years to a maximum of 354 years – and that he is entitled to a new sentencing because this is a violation of the Eighth Amendment.

(a) <u>Procedural Default</u>

This claim is procedurally defaulted as Rega only made reference to "cruel and unusual punishment" with regard to the sentence he received in his post-sentence motion.  (Resp't Ex. F, Post Sentence Mot., Feb. 5, 2004, ECF No. 29-2 at p.8, ¶13.) On direct appeal, Rega's challenge to his sentence only involved references to the Pennsylvania Sentencing Code and Guidelines.  (Resp't Ex. N, Br. for Appellant, Oct. 13, 2004, ECF No. 32-1 at pp.46-53.)  His sentencing claims were not presented or argued to the Pennsylvania Superior Court as Eighth Amendment or federal claims. When he finally raised this claim in its present form it was in his third PCRA petition and the PCRA court concluded that the claim was time-barred.  (Resp't Ex. II, Third PCRA Pet., Mar. 26, 2009, ECF No. 38-1); (Resp't Ex. LL, C.P. Jefferson Co. Notice of Intention to Dismiss Third PCRA Pet., Sept. 10, 2010, ECF No. 39-2.)

The claim is denied as procedurally defaulted because Rega has not overcome the default by demonstrating the requisite showing.

<u>Merits</u>

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.  Punishment is deemed cruel and unusual not only when it is "inherently barbaric," but also when it is disproportionate to the crime for which it is imposed. *Graham v. Florida*, 560 U.S. 48, 59, (2010); *see Weems v. United States*, 217 U.S. 349, 367, (1910) (referring to the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense").

A defendant may challenge the proportionality of a sentence under the Eighth Amendment under an "as-applied" challenge, like when a defendant contests the length of a certain term-of-years sentence as being disproportionate "given all the circumstances in a particular case." *Graham*, 560 U.S. at 59.[31]

In the context of an as-applied challenge, the United States Supreme Court has explained that the "narrow proportionality principle" of the Eighth Amendment "does not require strict proportionality between crime and sentence," but "forbids only extreme sentences that are grossly disproportionate to the crime." *Id*. at 59–60 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 997 (1991) (Kennedy, J., concurring)) (internal quotation marks omitted).  Before an appellate court concludes that a sentence is grossly disproportionate based on an as-applied challenge, the court first must determine that a "threshold comparison" of the gravity of the offense and the severity of the sentence "leads to an inference of gross disproportionality." *Id*. (quoting *Harmelin*, 501 U.S. at 1005 (Kennedy, J., concurring)) (brackets omitted).  In the "rare case" that a

---

[31]    In a "categorical" challenge, a defendant asserts that an entire class of sentences is disproportionate based on "the nature of the offense" or "the characteristics of the offender." *Id*. at 60.

reviewing court concludes that such an inference may be drawn, the court is required to compare the defendant's sentence: (1) to sentences for other offenses in the same jurisdiction; and (2) to sentences for similar offenses in other jurisdictions. *Id*. If this extended analysis validates the threshold determination that the sentence is grossly disproportionate, the sentence is deemed "cruel and unusual" punishment under the Eighth Amendment. *Id*.

The Supreme Court has identified a term-of-years sentence as being grossly disproportionate on only one occasion. In *Solem v. Helm*, 463 U.S. 277 (1983), a recidivist defendant had been sentenced to life imprisonment without parole for passing a bad check in the amount of $100. In reviewing the defendant's Eighth Amendment challenge to his sentence, the Court identified the following "objective criteria" to be used in conducting a full proportionality analysis: (1) "the gravity of the offense and the harshness of the penalty;" (2) "the sentences imposed on other criminals in the same jurisdiction;" and (3) "the sentences imposed for commission of the same crime in other jurisdictions." *Id*. at 292. Because the bad check crime was "one of the most passive felonies a person could commit" and the punishment was "the most severe" non-capital sentence available, the Court inferred that the defendant's sentence was grossly disproportionate. *Id*. at 296–97. Accordingly, the Court conducted an extended proportionality review, engaging in a comparative analysis of other penalties and other jurisdictions, and concluded that the defendant's sentence was unconstitutional. *Id*. at 296–300.

Since the decision in *Solem*, no defendant before the Supreme Court has been successful in establishing even a threshold inference of gross disproportionality. *See*,

*e.g.*, *Ewing v. California*, 538 U.S. 11 (2003); *Harmelin*, 501 U.S. 957 (1991); *Hutto v. Davis*, 454 U.S. 370 (1982) (per curiam); *Rummel v. Estelle*, 445 U.S. 263 (1980). Notably, in *Harmelin*, the Court upheld a life sentence without parole for a first-time felon convicted of possession of 672 grams of cocaine. *See Harmelin*, 501 U.S. at 961, 996. Justice Kennedy, whose concurrence in *Harmelin* later was regarded as the "controlling opinion" in that case, *Graham*, 560 U.S. at 59-60, contrasted the "passive" check fraud in *Solem* with the "pernicious" drug offenses that "threaten[ ] to cause grave harm to society" by contributing to "violence, crime, and social displacement." *Harmelin*, 501 U.S. at 1002-03 (Kennedy, J., concurring).

In another as-applied proportionality challenge, the Supreme Court in *Ewing* reviewed a prison sentence of 25 years to life under California's "three strikes" statute, imposed for theft of $1200 in merchandise. 538 U.S. at 19-20. Employing its analysis from *Solem*, the Court observed that the theft crime was "certainly not 'one of the most passive felonies a person could commit' " and could justify a prison sentence of between 25 years and life imprisonment. *Ewing*, 538 U.S. at 28 (plurality opinion) (quoting *Solem*, 463 U.S. at 296); *see also Lockyer v. Andrade*, 538 U.S. 63 (2003) (affirming, upon habeas review, a sentence under California's "three strikes" law of two consecutive terms of 25 years to life in prison for petty theft of videotapes worth about $150).

The United States Supreme Court has "emphasized the primacy of the legislature in setting sentences, the variety of legitimate penological schemes, the state-by-state diversity protected by our federal system, and the requirement that review be

guided by objective, rather than subjective factors." *Graham v. Florida*, 560 U.S. 48, 87 (2010) (J., Roberts, concurring in judgment).

In this case, Rega was sentenced to the upper end of the standard range on each individual sentence, ordered to run consecutively. The trial court explained its reasons for imposing Rega's sentence as follows: (1) Rega was on state parole when he committed the offenses; (2) there were multiple offenses against four different victims; (3) he had a substantial criminal history and prior parole violations; (4) he showed a lack of concern and remorse; (5) he exploited girls of lower socio-economic status; (6) and consecutive sentences would deter other like-minded individuals. (Resp't Ex. P, Pa. Super Ct. Op. and Order Aug. 22, 2005, ECF No. 32-3 at pp.7-8) (citing Resp't Ex. E, Sentencing Tr., Jan. 28, 2004, ECF No. 29-1 at pp.165-66.) In addressing whether Rega's sentence was inappropriate under the sentencing guidelines, the Pennsylvania Superior Court, on direct appeal from his conviction and sentence, concluded that the trial court did not abuse its discretion in fashioning the sentences as it did "taking into account [Rega's] background and characteristics, the particular circumstances of his sexual offenses, the protection of the community, and the deterrence of other sexual offenders." (Resp't Ex. P, Pa. Super. Ct. Op. and Order, Aug. 22, 2005, ECF No. 32-2 at p.8.)

Given the trial court's explanation for Rega's sentence, we can say for certain that this is not one of the "rare" cases where, based on Supreme Court precedent, a defendant's sentence would be considered grossly disproportionate to the crime of which he was convicted. Thus, Rega's sentence is not unconstitutional under the Eighth Amendment.

(10)  <u>Mr. Rega was denied due process and effective assistance of counsel</u>
       <u>when the trial court refused to grant a mistrial after Susan Jones told th[e] jury</u>
       <u>that Mr. Rega had been involved in a homicide and trial and appellate counsel</u>
       <u>failed to further object to this due process violation.</u>

In this claim, Rega alleges that Susan Jones told the jury that Rega was involved

in the Gateway Lodge homicide, a crime unrelated to the offenses for which he was

being tried.  He claims that trial counsel was ineffective when he moved for a mistrial

but otherwise failed to object to this testimony, and also that the trial court erred by

denying trial counsel's motion.  In addition he claims that appellate counsel was

ineffective for failing to raise this claim on direct appeal.

During Jones' cross-examination, the following exchange took place:

Q:      Were you arrested for your role in the homicide?

A:      I don't – what role in the homicide?

Q:      For helping get rid of the gun.

A:      I didn't get rid of the gun.

Q:      I understand the point you weren't involved in a homicide, but when the
        guy was killed in the homicide, you got to use some of the money, didn't
        you?

A:      Yes.

Q:      You took the money, the fruits of a murder, and used the money, is that
        right?

A:      My husband spent money on us.

Q:      Didn't you spend it on Christmas gifts for your kids?

A:      My husband did.  We picked out things together.

Q:      You told the police you read that there was a dead guy, a guy died, you
        read about it in the paper, right?  That's what you told the police?

A:     At first, yes.

Q:     You lied about that?  You knew the guy was dead all along, right?

A:     No.  I asked Rob about it.

(Resp't Ex. D, Jury Trial Tr., May 5, 2003, ECF No. 28-2 at p.70.)  At this point, trial

counsel asked to approach the bench and requested a mistrial based on Jones'

testimony.  *Id*. at p.71.  The motion was immediately denied; the judge stating, "She

said she asked Rob about it.  I'm going to deny it.  That's denied.  She didn't specifically

say he was involved.  Now be careful."  *Id*.

Rega, in his post-sentence motion, claimed that the trial court committed

reversible error in failing to grant the requested mistrial because Jones had implicated

Rega in an unrelated homicide.  (Resp't Ex. F, Post Sentene Mot., Feb. 5, 2004, ECF

No. 29-2 at p.4.)  In addressing this claim, the trial court stated:

> …. First of all, the specific statement made by the Commonwealth's
> witness when it was alleged she lied about knowing a decedent was dead
> and was told she knew the guy was dead all along, she answered quote
> "No.  I asked Rob about it."  See Transcript of Testimony, May 5, 2003,
> page 70.
>
> The Court would like to first indicate that it was the defense
> attorney's own accusation from opening statements throughout the trial
> that this defense witness was lying because of her role in a homicide.  The
> defendant and his attorney knew very well that the defendant already
> stood convicted of that homicide and had been sentenced to death on that
> homicide at an earlier date.  Accordingly, the defendant was at his own
> risk when he questioned, through his attorney, the role of Susan Jones in
> the homicide.
>
> Further, it should be noted that she did not directly implicate the
> defendant in the homicide but indicated she asked him about the death.
>
> Three cases cited by the defendant all involve situations where the
> Commonwealth, through its own questioning and witness, brought out
> evidence of separate unrelated crimes about the defendant.  These cases

are completely opposite of the testimony in this case where the defendant, through his counsel, specifically cross-examined the Commonwealth witness about the unrelated homicide alleging that her testimony was colored by the fact that Susan Jones was looking for favorable treatment in this other homicide case.  Specifically, defense counsel indicated that the defendant was not arrested for her role in the homicide.

The answer she gave was in response to defense question and further did not implicate the defendant Rega in the homicide, and as such, defense motion in that regard should be denied.

(Resp't Ex. L, C.P. Jefferson Co. Op. and Order, June 29, 2004, ECF No. 31-1 at p.12.)

Appellate counsel attempted to raise this issue on direct appeal, but the Pennsylvania Superior Court deemed the issue waived by reason of appellate counsel's failure to set forth an adequate analysis.  (Resp't Ex. P, Pa. Super. Ct. Op. and Order, Aug. 22, 2005, ECF No. 32-3 at p.15.)  The court did, however, note that the trial court effectively disposed of the issue.  *Id*.

The claim, again raised but this time in Rega's first PCRA petition, was reviewed by the Pennsylvania Superior Court who "reviewed the entire record" and "detect[ed] no basis upon which to disturb the initial ruling of the trial court that Jones' testimony did not reveal [Rega's] prior participation in or conviction for the homicide.  Indeed, there was not even a hint of his culpability in the homicide."  (Resp't Ex. CC, Pa. Super. Ct. Op. and Order, May 22, 2008, ECF No. 35-3 at p.17.)  Thus, the court concluded that Rega had "failed to demonstrate any merit to the underlying issue upon which he based his . . . claim of ineffectiveness, and . . . discern[ed] no basis to disturb the conclusion of the trial court that no post conviction relief was due."  *Id*.

Rega argues that "[b]y signaling to the jury that he had been involved in a homicide, Susan Jones succeeded in painting him as a dangerous felon[,]" and he was

"undeniably . . . prejudiced by the disclosure of this information to the jury." (Pet'r Am. Pet. for Writ of Habeas Corpus, ECF No. 21 at p.138.) He claims that trial counsel's failure to object to Jones' testimony other than to unsuccessfully request a mistrial was deficient performance and appellate counsel was ineffective for failing to raise this issue on direct appeal. *Id*.

In this case, the last state court to have been presented with Rega's alleged trial court error claim was the Pennsylvania Superior Court when it ruled on the claim in Rega's first PCRA petition. In reviewing the claim, the court addressed the merits and did not rely on its previous finding that the claim had been waived due to inadequate briefing. Thus, we will review the claim on its merits under the § 2254(d) habeas standard.

It is clear that Rega has not met his burden of showing that the state court's denial of his trial court error claim for failing to grant a mistrial when, according to Rega, Jones implied that Rega was involved in an unrelated homicide, was an objectively unreasonable application of Supreme Court precedent, and therefore he is not entitled to habeas relief. Furthermore, he has not shown that if any error occurred that it was not harmless under the *Brecht* standard.[32]

---

[32] Until recently, the "harmless error" standard under the AEDPA was unclear. Some courts had been using the "substantial and injurious effect" standard found in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), while others had been using the "harmless beyond a reasonable doubt" standard in *Chapman v. California*, 386 U.S. 18, 87 (1967), after the passage of AEDPA. The Supreme Court settled this issue in *Fry v. Pliler*, 551 U.S. 112 (2007). *Fry* held that federal habeas courts need apply only *Brecht*, because the *Brecht* test "obviously subsumes" the *Chapman* / § 2254(d) analysis. *Fry*, 551 U.S. at 119-20.

Similarly, we find that Rega has failed to demonstrate that the state court's ruling regarding trial and appellate counsel's effectiveness in relation to this claim was contrary to or an unreasonable application of *Strickland*. The Pennsylvania Superior Court determined there was no merit to his claims that counsel were ineffective for failing to litigate properly the trial court error claim because of the lack of merit in his underlying claim of trial court error. Thus, Rega could not have suffered any prejudice by their actions.

Finally, we agree with Respondent that it is unclear exactly what trial counsel is alleged to have done wrong. He requested a mistrial. While Rega claims that he "failed to otherwise object," he does not specify what sort of objection he should have raised in addition to objecting and asking for a mistrial. *See Parrish v. Fulcomb*, 150 F.3d 326, 327 (3d Cir. 1998) (counsel will not be deemed ineffective for failing to present an argument without merit). Habeas relief is therefore denied as to this claim.

(11)   <u>All prior counsel were ineffective for failing to investigate and litigate the issues presented in this amended petition.</u>

Here, Rega asserts that all prior counsel were ineffective under the *Strickland* standard for failing to investigate and/or properly litigate the issues raised in the amended habeas petition. This claim is essentially Rega's attempt to overcome the procedural default of his claims by alleging that his counsels' ineffectiveness was the "cause" of his defaults; however, this claim too is procedurally defaulted.

"[F]or ineffective assistance of prior counsel to serve as 'cause' to excuse a procedural default, habeas petitioners must first exhaust the ineffective assistance claim itself in state court, or show cause and prejudice for that failure to exhaust." *Tome v.*

*Stickman*, 167 F.App'x 320, 325 (3d Cir. 2006) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000)); *Murray v. Carrier*, 477 U.S. 478, 489 (1986) ("[A] claim of ineffective assistance," we said, generally must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.")

Here, Rega has not presented to the state courts each claim of ineffective assistance of counsel for failing to investigate and litigate each specific claim in his amended petition. Because he has not done so, these individual claims of ineffective assistance of counsel cannot serve as "cause" to excuse any procedural default. This claim is thus denied as procedurally barred from habeas review.

    (12)   <u>Mr. Rega was denied due process because of the cumulative prejudicial effect of the errors in this case.</u>

Rega argues that the cumulative effect of "all the instances of deficient performance by trial, appellate and PCRA counsel set forth in th[e] Amended Habeas Petition, considered in combination with the other legal errors and constitutional violations in this case, created a reasonable probability that the outcome of [his] trial could have been different and amounted to prejudice under the Sixth Amendment."[33] (Pet'r Am. Pet. for Writ of Habeas Corpus, ECF No. 21 at p.141.)

---

[33]    In *Commonwealth v. Koehler*, 36 A.2d 121 (Pa. 2012), the Pennsylvania Supreme Court explained:

> [T]his Court has repeatedly held that no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009). Thus, to the extent claims are rejected for lack of arguable merit, there is no basis for an accumulation claim. *Commonwealth v. Sattazahn*, 597 Pa. 648, 952 A.2d 640, 671 (2008). When the failure of individual claims is grounded in lack of prejudice, however, then the cumulative prejudice from those individual claims may properly be assessed. *Johnson*, 966 A.2d at

"The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process." *Collins v. Secretary of Pennsylvania Dept. of Corrections*, 742 F.3d 528, 543 (3d Cir. 2014) (citing *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007)). In addressing cumulative error, the Third Circuit Court of Appeals has said that

> [i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice.

*Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (internal quotation marks omitted) (citations omitted).

*Brecht v. Abrahamson*, 507 U.S. 619 (1993), is the standard for evaluating this claim because "'a cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" *Albrecht*, 471 F.3d at 468 (quoting *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003)).

---

532 (citing *Commonwealth v. Perry*, 537 Pa. 385, 644 A.2s 705, 709 (1994), for the principle that a new trial may be awarded due to cumulative prejudice accrued through multiple instances of trial counsel's ineffective representation).

36 A.3d at 161.

We have not identified any single error, much less multiple errors that cumulatively would have resulted in actual prejudice sufficient enough to undermine the reliability of the jury's verdict.  Simply put, Rega has not shown a sufficient probability that the jury would have considered him innocent but for the improper acts alleged in his amended habeas petition.

It is clear that most of the alleged improper acts Rega relies upon in support of his cumulative error claim all stem from his belief that Jones had a prior deal with the Commonwealth before she testified at his trial and that had this deal been disclosed to the jury then that would have discredited her credibility and he would most likely not have been convicted.  Once again, there is no evidence that such deal existed, but nonetheless we fail to see the significance of Jones' testimony at Rega's trial.  As both parties point out, the whole case was a credibility battle, and because of the lack of physical and forensic evidence in the case, the victims' testimony took center stage and ultimately convinced the jury of Rega's guilt.  Thus, we do not see how the jury's decision would have been altered had Jones not testified.

Furthermore, even if, as Rega suggests, the whole case was based on a fabricated story concocted by Jones in an effort to curry favor with law enforcement, it is too big of a leap to infer that she had such power and influence over the victims so as to persuade them to go along with her plan specifically targeted at sending Rega to prison. This is particularly so given that all of the victims considered Rega to be a friend.

Absent whether a deal existed between Jones and the Commonwealth, (and Rega has not presented clear and convincing evidence that such deal did exist), just based on the fact that Jones had long-standing pending criminal charges for which she

remained out of jail, the jury could have, and likely did, easily discern that Jones'

cooperation with the Commonwealth was likely to be taken into consideration in the

future.

We do not believe that the verdict was unreliable even considering all of the

alleged violations identified by Rega, in the cumulative.  Thus, Rega is not entitled to

habeas relief on this claim.

(13)   Mr. Rega was denied effective assistance of counsel because trial counsel
failed to effectively impeach the complaining witnesses.

In Rega's supplement to his amended habeas petition, he raises one additional

claim, alleging that "trial counsel failed to investigate, develop and present extrinsic

impeachment evidence related to the complaining witness's lack of credibility."

(Supplement to Am. Pet. for Writ of Habeas Corpus, ECF No. 25 at p.2.)  Specifically,

counsel for Rega alleges that "[i]ndividuals in the community familiar with the

complaining witnesses'[] reputations were available to defense counsel prior to trial,

willing to speak with trial counsel and willing to testify at Mr. Rega's trial."  *Id*. at p.3.

Counsel states that he spoke to these individuals, namely Kendra Bigley, Elizabeth

Dulavitch and Thomas Fenstermaker, and discovered "numerous sources of extrinsic

impeachment evidence related to the complaining witnesses'[] lack of credibility."  *Id*. at

pp.3-4.

(a) Procedural Default

This claim is unexhausted because it was never raised in any proceeding prior to

this one.  Rega's counsel even admits as much in the supplemental petition.  For that

reason, and without hesitation, the claim is denied as procedurally defaulted.

(b) <u>Merits</u>

Alternatively, Rega has not shown that the claim has merit. Rega's counsel submitted three affidavits to support his claim that counsel was ineffective for failing to investigate the credibility of the four victims.[34] What little pertinent information is contained within these affidavits on the victims' character would likely not have been admissible under Pennsylvania Rule of Evidence 404(a), which prohibits the use of evidence of a person's character or trait of character to prove conduct in conformity therewith on a particular occasion.

---

[34] The first affidavit is submitted by Kendra Bigley, who simply states that "[B.H. and D.W.] are known as untrustworthy people." (Pet'r Supplement to Am. Pet. for Writ of Habeas Corpus, Aff. of Kendra Bigley, ECF No. 25-1 at p.2.) Besides this one general statement, she offers no pertinent information of the victims' character by failing to reference any specific event wherein she had personally knowledge of the victims' untrustworthiness. *Id*.

The second affidavit is submitted by Elizabeth Dulavitch, the daughter of Susan Jones. (Pet'r Supplement to Am. Pet. for Writ of Habeas Corpus, Aff. of Elizabeth Dulavitch, ECF No. 25-2 at pp.2-5.) However, the only pertinent personal information she relays about the victims' trustworthiness relates to a time where B.H. and D.W. called her parents and lied to them about why they were late. *Id*. at p.3. Elizabeth Dulavitch states that B.H. and D.W. told her parents that they had a flat tire but really they "were hanging out at a guy[']s house that [B.H.] was sleeping with." *Id*. She also states that one time when she was with her boyfriend at her mother's house, she went to the bathroom and came back to find [B.H.] giving her boyfriend oral sex. When confronted about the situation, B.H. lied and said that nothing had happened. *Id*. at p.4.

The final affidavit is offered from Thomas Fenstermaker, who did actually testify at Rega's trial. (Pet'r Supplement to Am. Pet. for Writ of Habeas Corpus, Aff. of Thomas Fenstermaker, ECF No. 25-3 at pp.2-3.) The only relevant information in Fenstermaker's affidavit is that both [B.H.] and [D.W.] admitted to him that they lied about Rega doing anything to them and that [B.H.] said she did not know why she called the cops. *Id*. at p.3. However, Fenstermaker actually testified to this very fact at trial. (Resp't Ex. E, Jury Trial Tr., May 6, 2003, ECF No. 29-1 at pp.184-91.)

Furthermore, even if such evidence was found to be admissible under Rule 404(a), which the Court does not think it would, it would almost certainly be barred by 18 Pa. C.S. § 3104, Pennsylvania's Rape Shield Law, which prohibits the defendant from introducing evidence of the alleged victim's past sexual conduct, including reputation evidence.[35]  The relevance of such evidence would be outweighed by its tendency to create unfair prejudice, particularly with the jury.

Rega has not shown that trial counsel was ineffective because the evidence he claims trial counsel failed to investigate and present at trial was (1) actually presented (Fenstermaker), (2) not relevant (Kendra Bigley), or (3) inadmissible under the Pennsylvania Rules of Evidence and Rape Shield Law (Elizabeth Dulavitch).  For the aforementioned reasons, this claim is denied as procedurally barred and alternatively it is without merit.

VI.  <u>Conclusion</u>

The Court has given Rega the benefit of the doubt by addressing almost every one of his claims on the merits, even though most if not all of them were in some way procedurally defaulted and barred from habeas review.  Rega has not demonstrated good cause and prejudice to excuse any of his defaulted claims, nor has he argued that manifest injustice would result by failing to consider his claims on the merits.  Moreover, and quite importantly, by choosing to clearly and unequivocally waive his right to post-

---

[35]    Pennsylvania Rule of Evidence 404(a) differs from Federal Rule of Evidence 404(a) in that F.R.E. 404(a)(2)(B) gives the defendant the right to introduce evidence of a pertinent trait or character of the alleged victim of the crime subject to the limitations in F.R.E. 412.  The Pennsylvania Rule differs in that Pennsylvania has not adopted Rule 412.  Instead, Pennsylvania recognizes statutory limitations on this right, in particular the Rape Shield Law, 18 Pa. C.S. § 3104.  *See* Comment to Pa.R.E. 404.

conviction counsel and represent himself in his first post-conviction proceedings, most of Rega's claims are defaulted by his own hand.

The Court has painstakingly reviewed the record in depth and in detail to the point of exhaustiveness. We have found nothing of concern, must less anything that would entitle Rega to habeas relief or further review by the Third Circuit Court of Appeals through the issuance of a Certificate of Appealability. *See* 28 U.S.C. § 2253(c) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."). Accordingly, a Certificate of Appealability will be denied. An appropriate Order will follow.

Date: September 30, 2015

s/David Stewart Cercone
David Stewart Cercone
United States District Judge

cc: Hunter S. Labovitz, Esquire
Jeffrey D. Burkett, Esquire

*(Via CM/ECF Electronic Mail)*